Edith CITRON, Plaintiff,

v.

E.I. DU PONT de NEMOURS & COMPA-
NY, Remington Arms Company, Phillip
H. Burdett, Joseph A. Dallas, Robert W.
Dixon, Richard E. Heckert, John P.
McAndrews, Eldon M. Robinson, Alex-
ander L. Stott, and Mrs. Frederick B.
Silliman, Jay H. McDowell and U.S.
Trust Company, Executors of the Es-
tate of Frederick B. Silliman, Defen-
dants.

Civ. A. No. 6219.

Court of Chancery of Delaware,
New Castle County.

Submitted: April 24, 1989.
Decided: June 29, 1990.

492

Victor F. Battaglia and Robert D. Goldberg, Biggs & Battaglia, Wilmington, Michael P. Fuchs, and Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff.

John F. Schmutz and Richard A. Paul, E.I. Du Pont de Nemours & Co., Legal Dept., Wilmington, Daniel M. Gribbon, Joanne B. Grossman, and Steven F. Reich, Covington and Burling, Washington, D.C., for defendants, E.I. Du Pont de Nemours & Co., Remington Arms Co., Joseph A. Dallas, Richard E. Heckert, John P. McAndrews and Eldon M. Robinson.

Charles F. Richards, Jr., Gregory P. Williams, and Robert J. Shaughnessy, Richards, Layton & Finger, Wilmington, Bruce D. Angiolillo and Gregory A. Ritter, Simpson, Thacher & Bartlett, New York City, for defendants, Philip H. Burdett, Robert E. Dixon, Alexander L. Stott, and Mrs. Frederick B. Silliman, Jay H. McDowell and U.S. Trust Co., Executors of Estate of Frederick B. Silliman.

## OPINION

JACOBS, Vice Chancellor.

This class action was commenced on July 9, 1980 by a Remington Arms Company ("Remington") shareholder, challenging the merger of Remington into E.I. DuPont de Nemours & Co. ("DuPont") on February 1, 1980. At the time of the merger, DuPont owned 69.54% of Remington's common stock and 99.8% of its preferred stock. In addition to DuPont and Remington, the plaintiff named as defendants the directors of Remington at the time of the merger. Three of those directors, Robert W. Dixon, Frederick B. Silliman,[1] and Alexander L. Stott, served as a committee of Remington's board of directors (the "Committee" or "Merger Committee") specially created to evaluate the merger proposal initially made by DuPont on July 16, 1979. In the merger DuPont ultimately acquired all shares of Remington common stock that it did not already own, by exchanging .574 DuPont share for each share of Remington. The complaint charged that the merger terms were grossly unfair and that the proxy statement disseminated in connection with the merger was false and misleading. After almost eight years of discovery and other pre-trial activities,[2] the case was tried on the merits between May 9 and May 17, 1988. Following posttrial briefing, the matter was argued on April 24, 1989.

This is the decision of the Court, after trial, on the merits of this action.

## I. THE FACTS

Remington, which was founded in 1816, manufactures and markets sporting firearms and ammunition, traps, targets, and ammunition components. Until the merger, Remington had 6,483,232 shares of common stock issued and outstanding, which were listed and traded on the American Stock Exchange.

DuPont is engaged principally in the manufacture and sale throughout the world of diversified lines of chemicals, plastics, specialty products, and fibers. In 1936, DuPont acquired 4,508,384 shares, representing 69.59%, of Remington's out-

1. Frederick B. Silliman died in August, 1987 and a suggestion of his death was filed on October 15, 1987. By stipulation and order dated February 18, 1988, all claims against Mr. Silliman were discontinued, and on April 11, 1988, the Executors of Mr. Silliman's Estate were substituted in place of Mr. Silliman.

2. On August 19, 1983, the defendants moved to dismiss the complaint, or, alternatively, for summary judgment. The plaintiff did not respond to this motion until about three years later, when she amended her complaint on April 17, 1986. On December 5, 1983, plaintiff obtained the certification of a shareholder class defined as "all persons (other than the defendants and members of the immediate families of the individual defendants) who were common stockholders of Remington Arms Company on February 1, 1980, the effective date of the merger which is the subject of this litigation."

standing common stock, and DuPont later came to own 99.87% of Remington's preferred shares. Thus, as of July, 1979 when the merger was first proposed, Remington had been a majority-owned subsidiary of DuPont for over forty years.

At the time of the merger, Remington's Board of Directors consisted of eight directors: Philip H. Burdett, Joseph A. Dallas, Robert W. Dixon, Richard E. Heckert, John P. McAndrews, Eldon M. Robinson, Frederick B. Silliman, and Alexander L. Stott. Messrs. Dallas, Heckert and Robinson were DuPont executives and employees. Mr. Burdett had been Remington's President since 1974, but retired from that position on July 31, 1979, six months before the merger was approved. Mr. McAndrews, who had previously been Remington's Executive Vice President, succeeded Mr. Burdett.

During the spring of 1979, DuPont began seriously to consider the possibility of acquiring the approximately 30% of Remington it did not already own. DuPont decided ultimately to acquire the Remington minority interest because 100% ownership of Remington would yield certain benefits, including the increased potential for Remington to diversify and achieve certain savings and economies. That decision was the culmination of years of internal deliberations over whether DuPont should acquire the Remington minority interest or, alternatively, dispose of its Remington holdings. During that period DuPont had received inquiries—but no firm offers—seeking to explore an acquisition of DuPont's Remington stock for approximately book value. Those inquiries all foundered on the issue of price. DuPont's low tax basis in its Remington stock, and the tax costs associated with selling its Remington holdings at the proposed prices, made DuPont's continued majority ownership of Remington a more attractive alternative.

In considering on what basis to acquire the Remington minority interest, DuPont was aware of its legal responsibilities as Remington's majority shareholder. It also knew that litigation challenging the acquisition was highly likely. Accordingly, one of DuPont's important objectives was to assure that the merger would be both fair to Remington's minority shareholders and economically justifiable to DuPont. In furtherance of that objective, DuPont made three critical decisions.

First, with one exception, DuPont decided not to formulate any merger terms on its own. Instead, it retained the investment banking firm of Morgan Stanley & Co. ("Morgan Stanley") to recommend merger terms that DuPont would then propose to Remington. The only exception was that the merger consideration would consist of DuPont stock rather than cash, so that Remington's shareholders would incur no immediate tax liability and could continue as DuPont stockholders if they chose.

Second, DuPont placed no constraints upon any valuation methodology that Morgan Stanley could use, or upon the terms that Morgan Stanley might ultimately recommend.

Third, the merger proposal would be made subject to "majority of the minority" approval, *i.e.*, approval by a majority of the shares voted by Remington's stockholders other than DuPont. In effect, DuPont gave the Remington minority the power to decide whether or not the merger should go forward.

Morgan Stanley conducted an extensive evaluation of the businesses, financial condition, prospects, and other relevant value-related aspects of Remington and DuPont. Based upon its valuation analysis, Morgan Stanley advised DuPont that a merger exchange ratio of .52 shares of DuPont stock for each share of Remington—representing an implied cash value of approximately $22 per Remington share—would be fair to the shareholders of both companies. Morgan Stanley also opined that a merger on that basis would represent a substantial premium for Remington's minority stockholders.[3]

---

**3.** Because Remington's stock market price in July, 1979 was about $15.63 per share, .52 of a DuPont share, having an indicated value of $22 per share, represented a 40% premium over market. See Section IV B (1), *infra*, of this Opinion.

Based upon Morgan Stanley's recommendation and analysis, DuPont formally proposed to Remington, on July 16, 1979, a stock for stock merger wherein DuPont would acquire the 30% Remington minority interest by exchanging .52 share of DuPont common stock for each share of Remington common stock.

Remington's Board of Directors responded to DuPont's proposal by creating the Merger Committee on July 18, 1979. That Committee was directed "to consider the merger proposal from DuPont ..., to retain on behalf of the minority shareholders such advisor or advisors as ... [the Committee] may deem prudent, and as promptly as may be reasonable to report their findings to the full Board." (PX 59). The Committee consisted of Messrs. Dixon, Silliman, and Stott, none of whom were Remington employees and all of whom were independent of, and had never been affiliated with or employed by, DuPont.[4]

Once formed, the Merger Committee took steps to organize itself and select legal and financial advisors. In that connection, the Committee had been advised that the full cooperation and resources of Remington and DuPont management would be made available.[5]

At its first meeting held on July 19, 1979, the Committee elected Mr. Stott as Chairman. It also decided to retain independent legal counsel and (with counsel's assistance) an investment banker as financial advisor. Because it desired "to insure a completely independent review of the proposal" (PX 60, at 2), the Committee selected its own counsel, rather than allowing Remington management to retain counsel on its behalf. The Committee also decided not to discuss any of its activities with Remington management without the prior approval of its counsel. As a result, throughout the entire decision making process no DuPont representative, and no Remington director affiliated with DuPont (i.e., Messrs. Heckert, Dallas, and Robinson), participated in any of the Merger Committee's deliberations or attempted to influence its decisions.

On July 23, 1979, the Committee met again to interview and retain outside counsel (DX 6). The Committee had decided beforehand to retain a major New York law firm, to assure that its legal advisors would have appropriate merger and acquisition expertise. Two distinguished firms were interviewed, and the Committee ultimately decided to retain Simpson, Thacher and Bartlett. That firm immediately prepared a memorandum to guide the Committee in interviewing investment banker candidates for the role of financial advisor. The Committee met a third time on July 26, 1979, to interview and retain an investment banking firm. After two nationally preeminent firms were interviewed and found exceptionally qualified, the Committee decided to retain Salomon Brothers on July 30, 1979.

Salomon Brothers spent August and September, 1979 gathering and studying financial information pertinent to its valuation of Remington and DuPont.[6] At a meeting

4. All three directors were substantial businessmen with extensive outside business experience. Mr. Stott had been Comptroller of American Telephone and Telegraph Co. from 1953 through 1973, and a Vice President from 1961 through 1973. As Comptroller, Mr. Stott was responsible for raising billions of dollars of public financing and had dealt with various investment banking firms. Mr. Silliman had been President (since 1969) and Treasurer (since 1974) of The Hydraulic Company, a New York Stock Exchange listed company. Mr. Dixon had been President of Harvey Hubbell, Inc., a publicly held manufacturer of electrical products, since 1973 and its Chief Executive Officer since 1975. In addition, all three had served as directors of other public corporations, including Burlington Northern, Stouffer Chemical, and City Trust Bancorp, Inc.

5. DuPont made available to the Committee its then Treasurer and Finance Department Managing Director, William E. Buxbaum, to facilitate the gathering of documents and information from DuPont. Similarly, Remington made available David A. Renken, a member of Remington management, to serve as the secretary, and liaison to the Merger Committee to facilitate securing all necessary data and documentation from Remington.

6. On August 20, Michael Zimmerman of Salomon Brothers wrote to DuPont's Mr. Buxbaum and to Remington's Mr. Partnoy, to request 17 categories of documents from DuPont and 21

held on August 31, 1979, the Merger Committee received a progress report from Salomon Brothers, which advised that while much of its financial review had been completed, it was not yet able to opine on the fairness of the proposed .52 merger exchange ratio. Salomon Brothers also expressed its concern that any fluctuation in the price of DuPont stock price could affect the cash value equivalent that a Remington stockholder who wished to sell his DuPont stock would receive in the merger. To reduce the uncertainty caused by potential market fluctuations, Salomon suggested a mechanism (described as a "collar") that is commonly used in stock-for-stock mergers. Under a collar arrangement, the exchange ratio would vary as the market price for DuPont stock fluctuates. That is, if the market price of DuPont's stock rose, fewer DuPont shares would be received by Remington shareholders; if DuPont's market price fell, more DuPont shares would be received. When the meeting concluded, the Committee decided to confer again with Salomon Brothers after Salomon had completed its interviews with Remington and DuPont managements.[7]

The Merger Committee met again on September 14, 1977. Jay Higgins of Salomon Brothers reviewed his firm's progress and reported that Salomon would probably be able to render its opinion during the last week of September. The Committee, nevertheless, pressed Salomon for its preliminary conclusions based on the work it had done. Higgins cautioned that Salomon Brothers' work was incomplete and that his views could not be construed as the official position of his firm, but subject to that caveat, he advised the Committee that Salomon would have a difficult time concluding that the proposed .52 exchange ratio was fair. There were two reasons. First, the dollar value to which .52 DuPont shares equated under the then-current market conditions, appeared to fall short of the fair value of a Remington share. Second, the risk of market price fluctuations for DuPont stock during the period from the issuance of a fairness opinion up to the merger, underscored the apparent inadequacy of the .52 exchange ratio. Mr. Higgins then explained the basis for his views, including the valuation measures that his firm had employed to test the fairness of the proposed exchange ratio. Those measures included a discounted cash flow analysis, a study of comparable transactions, and analyses of Remington and DuPont's financial results and stock trading histories. (DX 54).

The Committee reported Salomon's preliminary conclusion to the full Remington Board of Directors at its September 19, 1979 meeting. After hearing Mr. Stott's report (during which DuPont's director-designees absented themselves), the Board instructed Remington's President to communicate the Merger Committee's concerns to DuPont.

The Committee expressed its concerns to DuPont's investment banker, Morgan Stanley, at a meeting between representatives of Salomon Brothers and Morgan Stanley on September 25, 1979. Salomon Brothers advised Morgan Stanley that it was not satisfied that the .52 exchange ratio was fair, and that it (Salomon) was troubled by the absence of a collar to protect Remington's shareholders against pre-merger fluctuations in the DuPont stock price. In response, Morgan Stanley explained its reasons for concluding that the .52 exchange ratio was fair. When the meeting ended, both bankers agreed to report this discussion to their respective principals.

---

categories from Remington. The requested documents were promptly furnished.

**7.** On September 10, 1979, Salomon Brothers extensively interviewed members of Remington management on a host of topics, including the state of the firearms and ammunition industry, international sales, business prospects, marketing efforts, competition, the effect of proposed legislation, the outlook for hunting and target shooting, labor relations, capital expenditures, financial forecasts, products liability exposure, military and law enforcement business, relationship with DuPont, borrowings and costs of capital, dividend policy, minority stockholders, pension fund, insurance, investments, sales, raw materials, treasury stock and pending litigation. (DX 53). Salomon Brothers conducted similar interviews with DuPont management on September 13, 1979.

Five days later, Remington communicated directly and formally to DuPont the Merger Committee's view that the .52 proposal was not acceptable. That occurred at a critical meeting held on September 30, 1979 in Bridgeport, Connecticut, among officials of Remington and DuPont and their respective legal and financial advisors. Present for Remington were the members of the Merger Committee, Messrs. Burdett, McAndrews and Partnoy, Salomon Brothers' Zimmerman and Higgins, and Salomon's outside counsel. Present for DuPont (in addition to Morgan Stanley representatives) were Irving S. Shapiro, then Chairman of DuPont's Board of Directors, and Richard E. Heckert, its then Senior Vice President.[8]

The meeting, which was lengthy and intense, lasted from noontime until approximately 10:00 p.m. Mr. Shapiro opened the meeting presenting DuPont's views as to why the .52 merger proposal was fair. Morgan Stanley then explained why it believed that .52 exchange ratio was the most that could be justified from DuPont's standpoint. Salomon Brothers countered by explaining why it had rejected the .52 proposal and could not opine that the DuPont proposal was fair. The bottom line was that the Committee informed DuPont that they could not recommend the proposal's acceptance.

Having stated their respective positions, the parties next began to explore, and later began negotiating in earnest, a revised proposal. Throughout that process, the parties understood that they were under no compulsion to reach any agreement and that, under the ground rules established by DuPont, no corporate combination could be effected without the Merger Committee's concurrence.

At approximately 4:00 p.m., after further negotiations, DuPont offered to increase the merger exchange ratio from .52 to .55. The Merger Committee responded by caucusing with Salomon Brothers, and later

informed DuPont's representatives that the Committee remained troubled by the absence of a collar. That problem had to be addressed, because "if there was no collar, there was no deal." (TR V at 109). DuPont responded that it had made its best offer, and at that point it appeared that the talks would break off.

The logjam later broke only after Mr. Heckert agreed to telephone Mr. Shapiro (who had departed by then) to explore the possibility of a collar. After doing so, Heckert reported that DuPont would agree to a collar arrangement, provided that it worked "both ways"; that is, the collar must also protect DuPont in the event its stock market price increased. DuPont then proposed an arrangement whereby the merger exchange ratio could vary from .52 to a maximum of .581 DuPont shares, depending upon the fluctuations in DuPont's stock price. As ultimately proposed, the collar would operate as follows:

1) The collar would not come into effect (that is, the merger ratio would remain at .55) if the average market price of DuPont stock during a specified period was not less than $42¼ per share or more than $47 per share. Only if the market price of DuPont common stock fell outside that range during that period would the collar come into play.[9]

2) If the average market price of DuPont stock rose to between $47 and $49.71, the ratio would decrease so as to maintain a value of $25.85 per share; however, if the average market price increased to above $49.71, the ratio would be .52.

3) If the average market price of DuPont stock fell to within a range of from $40 to less than $42.75, the ratio would increase to maintain a value of $23.24 per share; however, if the average market price fell to below $40 per share, the ratio would be .581.

After the meeting ended, Salomon Brothers began to evaluate DuPont's revised

---

8. By the time of the trial, Mr. Heckert, who testified as a witness, had become Chairman of the Board.

9. The "specified period" was later agreed to be the ten trading days preceding the day before the Remington stockholders' meeting to consider the merger proposal.

proposal, and continued doing so for much of the following day. Salomon ultimately reduced its evaluation to two written analyses. The first of these examined the effect of the revised proposal upon the dividends, earnings, and book value per share that the minority stockholders would enjoy at different assumed exchange ratios under the collar arrangement. (DX 29 at S10012). The second analysis focused upon the cash equivalent value of the DuPont stock that Remington's stockholders would receive, assuming various trading prices of DuPont stock. From those figures Salomon calculated a price-earnings ratio for the proposed transaction, and also compared the implied cash value of the transaction with Remington's book value per share. (DX 29 at S10006). These analyses were delivered to the Committee on October 1, 1979.

On October 2, the Merger Committee met with Salomon Brothers to review its analyses of the revised proposal. By then the Committee was quite familiar with many of the elements of that analysis, which had been discussed at length during the ten hour Bridgeport meeting two days before. Salomon's analyses were based upon the earlier valuation that it had prepared and discussed with the Committee during September. (DX 54). At the conclusion of the meeting, Salomon Brothers formally delivered its opinion that the revised merger exchange ratio proposal was fair, from a financial point of view, to Remington's minority stockholders.

The Remington Board of Directors met that same day. Based upon the Committee's recommendation that the revised merger proposal be approved, the Remington Board (excluding the DuPont representatives, who had absented themselves from the meeting) approved the revised proposal.

After October 1, the Merger Committee continued to maintain an active role. During October, 1979, there was considerable upheaval in the stock market, which caused the price of DuPont stock abruptly to drop. As a consequence the Merger Committee met on October 30, 1979 to determine whether Salomon would adhere to its Octo-ber 2 fairness opinion. The Committee extensively interrogated Salomon's representatives, noting that DuPont's stock price had dropped to $38 per share that same day, and pointedly asking Salomon whether the proposed merger would be fair if the final exchange ratio were based on that lower market price. Salomon stated that the transaction would still be fair, and emphasized that the recent plunge in DuPont's stock price only underscored the importance of the collar.

On November 19, 1979, DuPont and Remington executed a definitive merger agreement. A special Remington shareholders meeting to consider the merger was scheduled for January 17, 1980. In that connection, a proxy statement concerning the proposed merger (which included Salomon Brothers' updated opinion) was mailed to Remington shareholders on December 3, 1979.

Two subsequent events resulted in the supplementation of that proxy statement. The first was that on December 28, 1979, an action attacking the merger was filed in the New York Supreme Court. (That action was later dismissed on *forum non conveniens* grounds). Remington's shareholders were notified of the New York action, and the claims asserted therein, in a proxy statement supplement that was mailed on January 4, 1980. The second event was that on January 4, 1980, DuPont received an inquiry from Allegheny Ludlum Industries concerning a possible purchase of DuPont's Remington stock at approximately $26 per share. Because that proposal would have involved a taxable transaction, DuPont had no interest in pursuing it, and so informed Allegheny Ludlum. On January 4, 1980, DuPont issued a press release, and Remington issued a second supplement to its proxy statement, disclosing the Allegheny Ludlum inquiry and DuPont's response.

To afford its shareholders a meaningful opportunity to review the supplemental proxy information, Remington adjourned the January 17, 1980 shareholders' meeting to February 1, 1980. At the adjourned meeting, 91% of the minority shares that

were voted, representing 72% of Remington's outstanding minority shares, were cast in favor of the merger. All told, 92% of Remington's total outstanding common shares voted to approve the merger.

Because of the operation of the collar arrangement, the ultimate merger exchange ratio was .574 DuPont share for each share of Remington. That ratio represented, as of the merger date, an implied cash equivalent value of $23.46 per Remington share.[10]

## II. THE CONTENTIONS

The plaintiff attacks the merger as the product of self-dealing and unfair dealing by DuPont and gross negligence by Remington's directors. Plaintiff argues that the defendants' conduct deprives the transaction of the protection of the business judgment rule and imposes upon the defendants the burden to establish that the merger was entirely fair. The merger is said to be unfair because, among other things, the fair value of the Remington shares surrendered in the merger was from $5.76 to $7.01 per share *above the value of the DuPont shares received in exchange.* That difference represents between $11,-341,595 and $13,802,879 of claimed damages to the shareholder class, for which the plaintiff seeks to have the defendants held joint and severally liable.

The plaintiff contends that DuPont, as Remington's majority shareholder, breached its fiduciary duty of loyalty to Remington's minority shareholders, by proposing a clearly inadequate merger that it knew Remington's directors would not be in a position to oppose. Plaintiff further contends that defendant Richard Heckert violated his duty of loyalty as a Remington director by participating in the September 30 merger negotiations on DuPont's behalf.

The plaintiff also claims that Remington's directors breached their duty of care

by considering, evaluating, negotiating, and approving the merger in a grossly negligent manner.[11] Specifically, the plaintiff contends that the Merger Committee erroneously believed that it was not required to evaluate and determine the fairness of DuPont's proposal. Rather, plaintiff argues, the Committee perceived its function as being simply to obtain an investment banker's opinion that the DuPont merger proposal was fair, and then passively to submit the merger proposal to Remington's stockholders without independently determining its fairness. Based upon that flawed conception of its role, the Committee failed properly to supervise or direct Salomon Brothers' activities, and blindly relied upon Salomon's opinion that the merger proposal was fair, even though Salomon had no basis for so concluding. The plaintiff urges that if Salomon had properly determined Remington's fair value, the Merger Committee would have realized that Remington was worth far more than DuPont was proposing to pay. That fundamental error, plaintiff says, was exacerbated by the Merger Committee's superficial approach to conducting its deliberations. Most egregious was the Committee's decision to ignore negative reports by financial analysts and criticisms by stockholders that would have alerted the Committee to the inadequacy of DuPont's proposal. The plaintiff concludes that the totality of the directors' conduct compels a finding that they were grossly negligent.

Finally, all defendants are charged with violating their fiduciary duty of candor to Remington stockholders, by omitting from the proxy statement material facts that, if disclosed, would have revealed the unfairness of the proposed merger.

## III. THE APPLICABLE LIABILITY STANDARDS AND BURDEN OF PROOF

Before turning to the merits of the plaintiff's claims, the Court must address three

---

**10.** On the day of the merger, DuPont stock closed at $40.87. The implied cash value of the merger terms was $40.87 × .574 = $23.46.

**11.** Plaintiff contends that the Remington directors also breached their duty of loyalty by not opposing the will of the majority stockhold-

er, DuPont. That argument, however, consists of a single "throwaway" sentence that finds no support in plaintiff's brief or in the record. Thus, the plaintiff's real claim against the Remington directors is essentially one of gross negligence.

preliminary questions. First, under what liability standard will the defendants' conduct be evaluated and adjudged? Second, who bears the burden of proof? Third, are the plaintiff's proxy disclosure claims, which bear importantly upon the allocation of the burden of proof, valid? Accordingly, Part A, *infra*, of this Section determines the review standard applicable to the Remington director defendants. Part B addresses the liability standard applicable to DuPont. Because of the importance of the shareholder ratification issue to that analysis, Part C determines the plaintiff's proxy disclosure claims.

### A. The Liability Standard Applicable to The Remington Director Defendants

■ The liability standard applicable to the Remington directors is uncontroversial. The only Remington directors against whom any arguable claim can be asserted are those who were not affiliated with DuPont, because the DuPont director-designees played no role in the Merger Committee's, or the Board's, decisionmaking process. On that ground alone plaintiff has failed to establish a factual or legal basis for a claim against Remington's DuPont-affiliated directors.[12]

■ As for the independent Remington directors, the plaintiff does not dispute that their conduct is subject to the business judgment form of review. As our Supreme Court has recognized the business judgment rule operates both as a procedural rule of evidence and a substantive rule of law:

> As a rule of evidence, it creates "a presumption that in making a business decision, the directors of a corporation acted on an informed basis [*i.e.*, with due care],

in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1985). The burden falls upon the proponent of a claim to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing, or that the directors either lacked good faith or failed to exercise due care.... If the proponent fails to meet her burden of establishing facts rebutting the presumption, the business judgment rule, as a substantive rule of law, will attach to protect the directors and the decisions they make.

*Citron v. Fairchild Camera & Instrument Corp.,* Del.Supr., 569 A.2d 53, 64 (1989) (citation omitted, bracketed material in original).

The plaintiff makes no argument that Remington's independent directors had a conflicting self interest or acted in bad faith. Her sole claim, as earlier noted, is that those directors, in negotiating, evaluating and approving the merger, failed to act with appropriate due care. Accordingly, their conduct will be judged solely on that basis.

### B. The Liability Standard Applicable to DuPont

■ More heavily controverted is the liability standard applicable to the claims against DuPont. The plaintiff contends that the applicable test is that of "entire

---

**12.** Indeed, the plaintiff does not charge the DuPont-affiliated directors with any specific wrong, except for defendant Heckert, who participated in the September 30, 1979 Bridgeport meeting where the revised merger proposal was negotiated. The plaintiff claims that Mr. Heckert breached his duty of loyalty to Remington by participating in these negotiations on the DuPont side. However, plaintiff made no effort to show how Mr. Heckert's limited role in bringing the two sides together on terms that ad-

dressed the specific concerns identified by the Merger Committee and its advisors, caused any actionable harm to the plaintiff class. That is, even if it were assumed *arguendo* that the merger terms were unfair, Mr. Heckert is not one of the persons whose decisionmaking actions caused that result to come about. Accordingly, the claim against defendant Heckert, apart from being untimely (having not been asserted in the amended complaint, the pretrial order, or in plaintiff's pretrial brief) is without basis in fact.

fairness." That standard flows from the principle that where a majority stockholder stands on both sides of a challenged transaction, it has the burden of demonstrating, after careful scrutiny by the Court, that the transaction was entirely fair to the minority. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 109–10 (1952).[13]

DuPont ardently disagrees. It contends that because it did not compel Remington's agreement to the merger or otherwise dictate its terms, and that because the merger was negotiated and approved by fully independent and disinterested Remington directors, (i) DuPont should not be required to prove the merger's entire fairness (although in fact, DuPont argues, the merger was entirely fair), and (ii) its conduct must be evaluated under the business judgment rule standard of review.

For the reasons now discussed, I conclude that neither side's position is entirely correct. The validity of the merger and of DuPont's conduct as Remington's majority stockholder must be evaluated in accordance with the "entire fairness" standard. However, because the merger was ratified by a fully informed majority of Remington's minority stockholders (See Part III C of this Opinion, *infra*), the burden will shift to the plaintiff to prove that the merger was unfair. *Rosenblatt,* 493 A.2d at 937.

It is undisputed that DuPont, as the majority stockholder standing on both sides of the transaction, would normally have the burden to prove that the merger was en-

tirely fair. However, this case poses the question whether the validity of the merger and DuPont's liability should be reviewed under the less exacting business judgment standard, because of (a) ratification by Remington's minority stockholders, (b) negotiation and approval by a committee of disinterested, independent directors, or (c) both.

In reviewing the statutory and case law on this subject, a useful starting point is 8 *Del.C.* § 144. That statute essentially provides that an "interested" transaction between a corporation and its directors (or between the corporation and an entity in which the corporation's directors are also directors or have a financial interest) will not be void or voidable solely for that reason, if the transaction (i) is approved in good faith by a majority of informed, disinterested directors, or (ii) is ratified by an informed, good faith vote of shareholders, or (iii) is fair to the corporation at the time it is approved.

Section 144 was most recently construed in *Marciano v. Nakash,* Del.Supr., 535 A.2d 400, 403–05 (1987), a case involving a challenge, on fairness grounds, to the validity of a loan made to the corporation by certain of its directors. The Supreme Court, applying § 144, held that because neither shareholder ratification nor disinterested director approval could be obtained (due to a deadlock), the "intrinsic fairness" review standard would govern. However, the Court noted that:

"[A]pproval by fully informed disinterested directors under section 144(a)(1) or disinterested stockholders under section 144(a)(2), permits invocation of the busi-

---

**13.** The precise circumstances that will trigger the "entire fairness" standard of review have not been consistently articulated in the Delaware cases. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 712, 720 (1971), holds that the plaintiff must demonstrate that the parent corporation stood on both sides of the transaction *and* have dictated its terms. *See also, Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 n. 27 (1989). However, *Bershad v. Curtiss–Wright Corp.,* Del.Supr., 535 A.2d 840, 845 (1987); *Rosenblatt,* 493 A.2d at 937; *Weinberger v. UOP, Inc.,* 457 A.2d at 710; and *Sterling,* 93 A.2d at 109–10, indicate that to invoke that ex-

acting review standard, all that is required is that the parent corporation have stood on both sides of the transaction. Being the most recent pronouncements of the Supreme Court in the parent-subsidiary merger context, *Weinberger, Rosenblatt,* and *Bershad* are authoritative. As for the analytical significance of whether or not the parent corporation has dictated the terms of the transaction, the *Rosenblatt* court treated that factor as probative of "fair dealing"; that is, the fact that the parent did not dictate the terms of the merger evidences that the parent has dealt fairly with the minority shareholders.

ness judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction."

*Marciano*, 535 A.2d at 405, n. 3.

Except in the case of parent-subsidiary mergers, our courts have applied the same analysis, and reached similar results, in interested transaction cases that were not decided under § 144 [14]. *Puma v. Marriott*, Del.Ch., 283 A.2d 693 (1971) (applying business judgment standard of review where disinterested directors approved the purchase of six corporations owned by the Marriott family group, including inside directors, according to terms that the inside directors did not dictate); *See also Michelson v. Duncan*, Del.Supr., 407 A.2d 211, 224 (1979); *Gottlieb v. Heyden Chem. Corp.*, Del.Supr., 91 A.2d 57, 59 (1952); and *Kaufman v. Shoenberg*, Del.Ch., 91 A.2d 786, 793 (1952) (all holding that shareholder ratification of challenged stock options issued to directors shifts the burden of proof to the plaintiff and causes the transaction to be reviewed under the business judgment standard). The same result has been reached in cases involving mergers with acquirors who were fiduciaries but did not own a controlling stock interest in the corporation. *See, In re Resorts International Shareholders Litigation Appeals*, Del.Supr., 570 A.2d 259 (1990); *In re Formica Corporation Shareholders Litigation*, Del.Ch., C.A. No. 10598, Jacobs, V.C., 1989 WL 25812 (Mar. 22, 1989); *In re RJR Nabisco, Inc., Shareholders Litig.*, Del.Ch.,

C.A. No. 10389, Allen, C., 1989 WL 7036 (Jan. 31, 1989).

The question posed here is whether the business judgment form of review will also govern a parent-subsidiary merger that is either negotiated on behalf of the subsidiary by a committee of disinterested, independent directors, or is ratified by the informed vote of disinterested minority shareholders, or both. Although it did not decide that issue, *Weinberger v. UOP, Inc.*, contains language from which that result (the application of the business judgment standard) might be inferred [15]. However, subsequent case law confirms that that inference is erroneous.

In *Rosenblatt, supra*, a special committee of the subsidiary's independent directors negotiated (quite adversarily) a merger with the corporate parent. The merger was later ratified by the subsidiary's minority stockholders. The *Rosenblatt* court (citing *Weinberger v. UOP, Inc.*, 457 A.2d at 703) held that minority stockholder ratification "shifts the burden of proving the unfairness of the merger entirely to the plaintiffs." 493 A.2d at 937, However, in evaluating the claims against the parent corporation, the Supreme Court did not apply the business judgment standard of review. Instead, it employed the "entire fairness" mode of analysis, imposing the ultimate burden of persuasion upon the plaintiff.[16]

 *Rosenblatt* indicates that minority stockholder ratification of a parent-subsidiary merger, will not cause the transac-

---

**14.** Section 144 does not provide the exclusive validation standard for interested transactions. *Marciano v. Nakash*, 535 A.2d at 403.

**15.** In *Weinberger v. UOP, Inc.*, the Court held that majority-of-the-minority shareholder ratification of a parent-subsidiary merger will shift the burden to the plaintiff "to show that the transaction was unfair to the minority." 457 A.2d at 703. The *Weinberger* Court cited *Michelson v. Duncan*, Del.Supr., 407 A.2d 211, 224 (1979), thereby suggesting that the substantive review standard would be the business judgment rule.

In *In re Trans World Airlines, Inc., Shareholders Litigation*, Del.Ch., C.A. No. 9844, Allen, C., Mem.Op. at 16, 1988 WL 111271 (Oct. 21, 1988), this Court, citing *Weinberger v. UOP, Inc.*, drew

that inference. However, the Court did not cite the Supreme Court's *Rosenblatt* decision, *supra*, which casts doubt upon the *Trans World Airlines* court's application of the business judgment standard of review.

**16.** As for the liability standard applicable to the subsidiary's directors, the *Rosenblatt* court stated that adversarial, arm's length negotiations by a special committee of directors *"may* give rise to the proposition that the directors' actions are more appropriately measured by business judgment standards." 493 A.2d at 937–38 (emphasis added). However, nowhere does the *Rosenblatt* opinion suggest that in these circumstances the claims against the parent corporation would likewise be evaluated under the business judgment standard.

tion to be evaluated under the business judgment review standard that normally applies to challenged stock options or the other above described corporate transactions. Rather, in a parent-subsidiary merger context, shareholder ratification operates only to shift the burden of persuasion, not to change the substantive standard of review (entire fairness). Nor does the fact that the merger was negotiated by a committee of independent, disinterested directors alter the review standard.

Thus, shareholder ratification and disinterested director intervention have a different procedural effect where the transaction is a parent-subsidiary merger, than in cases where the transaction is with a fiduciary that does not control the corporation. Although the Delaware cases do not articulate a distinction in those terms, a plausible basis exists for it. Parent subsidiary mergers, unlike stock options, are proposed by a party that controls, and will continue to control, the corporation, whether or not the minority stockholders vote to approve or reject the transaction. The controlling stockholder relationship has the inherent potential to influence, however subtly, the vote of minority stockholders in a manner that is not likely to occur in a transaction with a noncontrolling party.

Even where no coercion is intended, shareholders voting on a parent subsidiary merger might perceive that their disapproval could risk retaliation of some kind by the controlling stockholder. For example, the controlling stockholder might decide to stop dividend payments or to effect a subsequent cash out merger at a less favorable price, for which the remedy would be time consuming and costly litigation. At the very least, the potential for that perception, and its possible impact upon a shareholder vote, could never be fully eliminated. Consequently, in a merger between the corporation and its controlling stockholder—even one negotiated by disinterested, independent directors—no court could

be certain whether the transaction terms fully approximate what truly independent parties would have achieved in an arm's length negotiation. Given that uncertainty, a court might well conclude that even minority shareholders who have ratified a parent-subsidiary merger need procedural protections beyond those afforded by full disclosure of all material facts. One way to provide such protections would be to adhere to the more stringent entire fairness standard of judicial review.

Accordingly, the *Rosenblatt* review standard will govern the Court's evaluation of DuPont's conduct and liability in the case at bar.

### C. The Disclosure Claims

Finally, I address the disclosure claims, which form a essential predicate for the application of the *Rosenblatt* review standard.

■ It is axiomatic that for shareholder ratification of any corporate action to be valid, the vote of the minority shareholders must be *fully informed*. That means, in this context, that the proxy statement must have disclosed all facts material to the Remington minority stockholders' decision to approve or disapprove the proposed merger. *Rosenblatt*, 493 A.2d at 944–45; *Weinberger v. UOP, Inc.*, 457 A.2d at 710; see also *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976). The parties who assert the defense of shareholder ratification have the burden to establish that they fully disclosed all material facts in their proxy disclosures. *Rosenblatt*, 493 A.2d at 937; *Weinberger v. UOP, Inc.*, 457 A.2d at 703.

■ Remington's minority stockholders overwhelmingly approved the merger on the basis of the extensive proxy statement. In an effort to avoid the burden-shifting effect of shareholder ratification,[17] the

---

**17.** In her post-trial brief, the plaintiff appears to characterize her proxy claims as an additional affirmative ground for imposing liability. At oral argument, however, plaintiff's counsel stated that the sole function of the disclosure claims

is to negative the validity (and, as a consequence, the burden-shifting effect) of minority shareholder ratification. (Tr., April 24, 1989 oral argument, at 33). In any event, the Court finds that the proxy claims, whether viewed as a

plaintiff claims that the proxy statement omitted to disclose certain material facts. I find the plaintiff's proxy claims to be without merit.

i) Plaintiff asserts that the proxy statement was misleading because it failed to disclose an internal financial study of Remington prepared by Mr. Gerald Brunner, an analyst in DuPont's finance department. Mr. Brunner calculated a value for Remington of $36.38 per share, based upon the discounted present value of expected future dividend payments. However, that calculation was not made to value Remington for merger purposes and DuPont did not rely upon it in connection with its acquisition of the Remington minority shares. Indeed, Mr. Buxbaum, who was Brunner's superior, contemporaneously rejected certain of Brunner's key assumptions. Brunner's calculations were intended only to illustrate a way to determine the price at which DuPont could "break even" if it chose to sell its Remington majority interest, taking into account the large anticipated tax liability that would be occasioned by DuPont's low tax basis in its Remington stock.

Accordingly, the Brunner $36.38 computation did not constitute sufficiently reliable evidence of Remington's value to warrant proxy statement disclosure. *See Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 128–29 (1986).

ii) The plaintiff next argues that the proxy statement should have disclosed that Remington Farms, a Remington owned facility that was carried on Remington's balance sheet at book value (approximately $635,000), had been appraised at $5 million.

That argument incorrectly assumes that Remington Arms was a surplus asset, unnecessary to Remington's business, that could have been sold for cash at fair market value. In fact, Remington Farms was not a surplus asset, but was an integral part of the educational and public relations side of Remington's business. If defendants were obligated to disclose the ap-

praised value of Remington Farms, then arguably they were also required to disclose the market value of Remington's other operating assets, such as (for example) its factories and major equipment. Yet the plaintiff makes no such contention. Instead, she has singled out only Remington Farms. Moreover, and in all events, the $5 million appraised figure represented only 1.7% of the (fully disclosed) book value of Remington's total assets, and 1.5% of their (fully disclosed) replacement cost. In these circumstances, the $4.4 million difference between appraised and book value would have been quantitatively insignificant to a shareholder considering whether to approve the merger.

iii) Lastly, the plaintiff contends that the proxy materials should have disclosed the alleged inadequacy of Salomon Brothers' valuation methodology and of the Merger Committee's deliberations and negotiations with DuPont. That argument fails for two reasons. First, defendants are not required to confess corporate wrongdoing or engage in "self-flagellation" in proxy materials. *Seibert v. Harper & Row Publishers, Inc.,* Del.Ch., C.A. No. 6639, Berger, V.C., Let.Op. at 15–16, 1984 WL 21874 (Dec. 5, 1984); *Weinberger v. United Financial Corp.,* Del.Ch., C.A. No. 5915 (1979), Hartnett, V.C., Mem.Op. at 24, 1983 WL 20290 (Oct. 13, 1983); *Fisher v. United Technologies Corp.,* Del.Ch., C.A. No. 5847, Hartnett, V.C., Let.Op. at 8, 1981 WL 7615 (May 12, 1981); *accord, Michelson v. Duncan,* Del.Ch., 386 A.2d 1144, 1155 (1978), *aff'd in pert. part,* Del.Supr., 407 A.2d 211, 221–22 (1979). Second, the argument rests upon an invalid factual premise. As found and more fully discussed in Part V of this Opinion, the Merger Committee and its advisor, Salomon Brothers, acted properly in the discharge of their duties.

I therefore conclude that the Remington stockholder vote approving the merger was fully informed and valid.

---

affirmative basis for liability or merely as a basis for negating shareholder ratification, are

without factual or legal foundation.

## IV. THE CLAIMS AGAINST DUPONT

As our Supreme Court has stated in *Weinberger v. UOP, Inc.:*

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

457 A.2d at 711. The plaintiff contends that DuPont treated Remington's minority stockholders unfairly in both senses, that is, by dealing with them unfairly and by offering an unfair price. Those claims are now addressed.

### A. Fair Dealing

■ From whatever perspective it is viewed, the merger was the product of fair dealing. Built into the process by which the merger terms were set were procedural protections that tended to assure a fair result and to approximate what independent parties would have arrived at in an arm's length bargain. *Cf. Weinberger v. UOP, Inc.,* 457 A.2d at 710–11 n. 7.

DuPont did not dictate the terms of this transaction, other than to prescribe that it would be a stock-for-stock merger.[18] The transaction was negotiated on Remington's behalf by a committee of directors totally independent of DuPont. It was made subject to the approval of a majority of Remington's minority stockholders. Moreover, DuPont caused its Remington director nominees to absent themselves from the negotiations and decisionmaking process. Accordingly, the Merger Committee's deliberations were not influenced by DuPont or Remington management representatives, and throughout the process the Committee acted independently, advised by attorneys and investment bankers that it had selected and overseen. Finally, as the Court has found, Remington's minority shareholders overwhelmingly approved the merger based upon full disclosure of all material facts. (See Part III B, *supra* ). The presence of those procedural safeguards is strong evidence of fair dealing. *Rosenblatt,* 493 A.2d at 937–38; *Sealy Mattress Co. of N.J. v. Sealy, Inc.,* Del.Ch., 532 A.2d 1324, 1336 (1987); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 599 (1986).

Plaintiff specifies three claims of unfair dealing.[19] First, she argues that DuPont's 70% stock ownership of Remington made it much easier for DuPont to obtain "majority of the minority" stockholder approval, and that therefore DuPont must be found to have utilized its controlling position to facilitate that approval. The short answer is this *ipse dixit* is unsupported in law and fact and runs counter to the overwhelming evidence of record.

Second, plaintiff contends that DuPont did not proceed in good faith, as evidenced by its original offer of a .52 exchange ratio proposal that would have resulted in the dilution of dividends and earnings to Remington shareholders. But plaintiff's conclusion does not flow from her premise. The initial exchange ratio was independently formulated and recommended by Morgan Stanley, not DuPont. And although the Merger Committee chose to reject the initial merger terms, there is no evidence that Morgan Stanley or DuPont proposed those terms in other than a good faith belief that they were fair.

Third, plaintiff claims that DuPont dealt unfairly with Remington by not disclosing to the Remington Board the internally prepared Brunner discounted cash flow evaluation. That information has previously been found to be not material for purposes of mandated disclosure to shareholders.

---

18. DuPont declined to develop the initial merger proposal, leaving its formulation to its investment banker, Morgan Stanley, in its best judgment.

19. Apart from her proxy disclosure claims, which have been rejected.

(See Part III B, *supra*). Why that same information should be deemed material, and therefore a subject of mandated disclosure, to the Remington Board is nowhere cogently explained.[20]

For all these reasons, I conclude that in proposing and negotiating the merger terms with Remington, DuPont dealt fairly with Remington's minority stockholders. I next turn to the plaintiff's contention that DuPont treated the minority unfairly by imposing substantively unfair merger terms.

### B. Fair Price

In challenging the substantive fairness of the merger consideration, the plaintiff claims that the market equivalent value of the consideration received (.574 shares of DuPont stock for each share of Remington) was less than the fair or intrinsic value of the Remington shares given in exchange. Specifically, plaintiff contends that Remington's intrinsic value was $29 to $30.25 per share—$5.76 to $7.01 per share more than the $23.46 per share cash equivalent value of the DuPont shares received by Remington's minority stockholders.

The correct test of fairness is a merger is that " 'the minority stockholder shall receive the substantial equivalent in value of what he had before.' " *Rosenblatt*, 493 A.2d at 940, quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d at 114. The issue is whether the value of .574 shares of DuPont stock was the substantial equivalent in value of one share of Remington stock. The defendants' valuation evidence persuades me that it was. The plaintiff's contrary evidence is unpersuasive and insufficient to discharge her burden of proving that the merger price was unfair.

1. The Defendant's Evidence Supporting the Fairness of the Merger Consideration

Before considering the specific evidence relating to value, the Court notes prelimi-

narily that the merger terms were negotiated at arm's length between representatives of DuPont and of the Merger Committee which was independent of DuPont. That fact is significant, and our Supreme Court has so recognized:

> Particularly in the parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.

*Weinberger v. UOP, Inc.*, 457 A.2d at 709–10, n. 7.

In evaluating the fairness of the merger exchange ratio, the Merger Committee and its advisors were mindful that the consideration would have to be fair to two separate groups of Remington shareholders: those who would retain their DuPont stock received in the merger and those who would immediately sell their DuPont stock. To the former group the most important value factors were those bearing upon the value of DuPont stock as an ongoing investment. To the latter group the feature of greatest significance was the "implied cash value", *i.e.*, the amount for which the DuPont stock could be sold in the market. The evidence persuades me that both groups received the substantial equivalent in value of what they gave up.

In evaluating the DuPont stock as an ongoing investment, and in determining how much DuPont stock would equate to one share of Remington, the Merger Committee and its advisors employed several valuation measures. Among these the most prominent were dividends, earnings, book value, and stock price. The collar arrangement made it possible to compute for each company the comparative earnings, dividends, book value, and market price per share at the various exchange ratios that might result under that ar-

---

**20.** Unlike the Arledge–Chitiea document in *Weinberger v. UOP, Inc.*, 457 A.2d at 705, the Brunner memorandum was not prepared by officers of the majority stockholder who sat on the boards of both the parent corporation (here DuPont) and the subsidiary corporation to be acquired (here Remington). Moreover, there is no evidence that DuPont used the Brunner memorandum to Remington's disadvantage. *Cf. Rabkin v. Olin Corp.*, Del.Ch., Consol.C.A. 7547, Chandler, V.C., Mem.Op. at 22, 1990 WL 47648 (Apr. 17, 1990).

rangement. (DX 29). In that fashion it became possible to determine at which exchange ratio a given fraction of a DuPont share would yield earnings, dividends, and book values equivalent to the corresponding values represented by one share of Remington.[21]

A comparable study of those same value characteristics was also performed after the actual merger exchange ratio became known. Those studies demonstrate that a Remington stockholder who received .574 shares of DuPont for each Remington share acquired a security with improved investment quality in each of the foregoing respects, except for book value. The result is set forth in the chart (DX 75) on the following page:

| | Remington | DuPont | .574 DuPont | % Increase (Decrease) |
|---|---|---|---|---|
| **Share Price** | | | | |
| Close 7/16/79 (a) | $15.88 | $40.88 (b) | $23.46 | 47.8% |
| High 1979 (through July 16, 1979) | 16.88 | 40.88 (b) | 23.46 | 39.0 |
| Low 1979 (through July 16, 1979) | 14.38 | 40.88 (b) | 23.46 | 63.2 |
| Average 1979 (through July 16, 1979) | 15.50 | 40.88 (b) | 23.46 | 51.4 |
| **Indicated Annual Dividend** | | | | |
| Latest Ten Months ended Sept.1979 | $ 1.30 | $ 2.67 | $ 1.53 | 17.9% |
| Actual Year Ended Dec.1979 | 1.45 | 2.75 | 1.58 | 8.9 |
| **Earnings Per Share** | | | | |
| Fiscal Year ended Dec. 31, 1978 | $ 2.97 | $ 5.39 | $ 3.09 | 4.2% |
| Latest Ten Months ended Sept. 1979 | 3.56 | 6.53 | 3.75 | 5.3 |
| Actual Year ended Dec. 1979 | 3.30 | 6.42 | 3.69 | 11.7 |
| **Book Value Per Share** | | | | |
| Fiscal Year ended Dec. 31, 1978 | $20.53 | $31.45 | $18.05 | −12.1% |
| Actual as of Dec. 31, 1979 | 22.61 | 35.07 | 20.13 | −11.0 |

(a) Last trading day prior to announcement of DuPont's merger offer.

(b) Represents the final cash equivalent amount received by Remington shareholders based on the Feb. 1, 1980 closing prices of DuPont common stock of $40.88 . . . . .

---

As the foregoing chart indicates, a Remington shareholder received for each of his shares, .574 DuPont share having an implied equivalent cash value of $23.46 per share. Depending upon the date and market value measure selected, $23.46 represented a premium of from 39% to 61% above the market value(s) of Remington stock, which ranged from $14.38 to $16.88 per share. Similarly, .574 shares of DuPont represented both a divdend "pickup" ranging from 8.9% to 17.9% (depending upon the dividend period utilized) and an earnings per share increase of from 4.2% to 11.7%.

▉▉▉▉ The only value that did not increase was book value, which under the .574 ratio was diluted by 11% to 12%. However, book value, which is the original cost of an enterprise's assets, is regarded as of minor importance in assessing the fairness of a stock-for-stock merger exchange. *Bastian v. Bourns, Inc.,* Del.Ch., 256 A.2d 680, 683 (1969), *aff'd.,* Del.Supr., 278 A.2d 467 (1970). *Sterling v. Mayflower Hotel Corp.,* Del.Ch., 89 A.2d 862, 869 (1952), *aff'd. supra,* 93 A.2d 107. The other valuation measures are of far greater significance.

**21.** In all cases the market value of the DuPont stock received represented a premium above the market value of a share of Remington stock.

Of considerable importance also was the fact that DuPont common stock was a higher quality security than Remington stock. DuPont was far more diversified, it had far superior long term growth prospects, and it had earnings that public investors valued more highly than Remington's. Consequently, those Remington shareholders who chose to retain their DuPont shares as an ongoing investment received a security that represented, both quantitatively and qualitatively, an increase and improvement over the Remington shares that they surrendered.

The plaintiff criticizes the fairness of the merger consideration on several grounds. Those criticisms are treated in Part IV B(2) below, but one of them is addressed here because it attacks the underlying validity, on a conceptual level, of the defendants' valuation approach. In essence, the plaintiff argues that for the defendants to have properly evaluated the fairness of the exchange ratio, they had ·to determine the intrinsic or fair value of Remington's stock. That was necessary to assure fair treatment for those Remington shareholders who intended to sell their DuPont shares, because without knowing Remington's intrinsic value, the defendants could not determine whether the $23.46 share implied cash value represented a fair exchange. Plaintiff argues that the defendants never determined Remington's intrinsic value, but instead, improperly used Remington's depressed stock market price as the measure of Remington's value and as the benchmark of fairness.[22]

The short answer is that that is not what occurred. The defendants, did, in fact, determine that merger consideration was intrinsically fair on the basis of valuation measures in addition to Remington's stock market price. Mr. Zimmerman testified that Salomon Brothers determined that Remington's intrinsic value was from $22 to $25 per share, a range within which the $23.46 implied cash value comfortably fits. I find no reason to doubt the credibility of that testimony, which is corroborated by DX54, in particular Exhibit I–I, which is Salomon Brothers' discounted cash flow analysis of Remington. That analysis discloses, based upon assumed discount values of 18% and 20% (which Salomon believed were appropriate), and assumed terminal values of 4 and 6 times Remington's projected 1983 net earnings, an indicated range of discounted cash flow values between $22.40 and 25.51 per share. (DX 54, Exhibit I–I).

This is not to say that the discounted cash flow valuation is entitled to primary weight as affirmative evidence of value. Salomon itself did not regard that valuation as the focal point of its analysis, and the record does not disclose the precise reasoning which Salomon's intrinsic valuation rests. That evidence is, nonetheless, pertinent insofar as it establishes that (i) Salomon recognized that a fair value determination of Remington was needed in order to evaluate the fairness of the merger, and that (ii) Salomon did not regard Remington's market price as the exclusive measure of its fair or intrinsic value.

---

22. The plaintiff argues that the merger "premium" over Remington's market price was misleading and illusory, because Remington's market price in the summer of 1979 was artificially depressed as a result of little or no institutional interest in the stock. In evaluating Remington, Morgan Stanley recognized that the ownership profile of, and trading pattern in, Remington stock raised a question as to the reliability of the stock market price. Morgan Stanley concluded, nonetheless, that Remington's market price was a reasonable starting point for valuing the company, because (1) Remington was listed on the American Stock Exchange and provided regular and complete information to its shareholders, (2) the trading pattern in Remington stock was consistent, (3) Remington's stockholder profile showed some institutional ownership and many individual holders, and (4) Remington's price/earnings ratio was not out of line with the price/earnings ratios of similar companies. Having reviewed the evidence on this point, I am not persuaded by plaintiff's contention that the low level of institutional interest in Remington made Remington's market price so unreliable as to be unworthy of consideration for valuation purposes. In any event, Remington's market price was only one of many factors considered by both companies' investment bankers in reaching their conclusion that the merger was fair.

The evidence which best supports the plaintiff's position is that Salomon Brothers did not issue a formal opinion as to a specific intrinsic value or range of such values for Remington. In hindsight it would have been helpful if Salomon Brothers had done so, because that could well have eliminated a major ground for challenging this merger. However, that omission does not establish plaintiff's case. It is correct, as plaintiff argues, that DuPont, as a fiduciary, had a duty to treat the Remington minority fairly. But that fiduciary duty did not require that fairness be measured or determined by any specific valuation method or procedure. So long as the minority stockholders were given the "substantial equivalent in value of what ... [they] had before" (*Sterling*, 93 A.2d at 114), and so long as DuPont can prove, based upon sound and persuasive evidence, that it furnished that value equivalent, no orthodoxy prescribes or constricts the form that such proof should take. *Cf. Weinberger v. UOP, Inc.*, 457 A.2d at 712.

In this case the defendants chose to evaluate the fairness of the merger by determining the amount of DuPont stock that would be the fair value equivalent of a share of Remington, measured largely by fundamental investment characteristics that were generally applicable to Remington as a whole. That approach is consistent with the underlying thrust of a fair or intrinsic valuation, which is to value the entire corporation and allocate that value pro-rata to each of its shares. *See Cavalier Oil Corporation v. Harnett*, Del.Supr., 564 A.2d 1137 (1989). The approach utilized here was, in these circumstances, a valid method to determine the fairness of the DuPont–Remington merger, and the plaintiff has identified no legal authority or precept that would require an opposite conclusion.[23]

In short, the defendants have established, *prima facie*, that Remington's minority shareholders received the substantial, fair equivalent in value for the Remington shares that they surrendered in the merger. I now consider the plaintiff's contrary evidence and arguments.

### 2. The Plaintiff's Evidence of Unfairness of the Merger Price

Through the testimony of her valuation expert, Nathan Belfer, the plaintiff attempted to show that Remington's fair value considerably exceeded $23.46 per share. Mr. Belfer performed four separate valuation analyses: (a) a discounted cash flow valuation, (b) an adjusted book valuation, (c) an analysis based upon third party inquiries proposing an acquisition of the entire company, and (d) a valuation based upon the price earnings ratios of comparable companies. For the reasons now discussed, I find the plaintiff's evidence and contentions to be unpersuasive.

#### a) *The Discounted Cash Flow Analysis*

Mr. Belfer employed a discounted cash flow analysis of Remington to arrive at a value of $36.38 per share. In so doing, Belfer relied upon the Brunner memorandum for his critical assumptions, which included an 8% earnings growth rate and a 12% discount rate. In my view, Mr. Belfer's reliance upon the Brunner memorandum and assumptions was unwarranted.

To reiterate, the valuations in the Brunner memorandum were made not to value Remington stock for purposes of the merger, but, rather, to determine whether DuPont could sell its Remington shares on break even or economically advantageous terms. Brunner's valuation did not repre-

---

**23.** Nor has the plaintiff articulated a persuasive basis for distinguishing between the fairness of the consideration received by those Remington stockholders who chose to retain their DuPont stock received in the merger, and those who did not. If (as the Court has found) the DuPont shares received in the merger represented fair consideration to those Remington stockholders who elected to retain their DuPont shares, then why would not the market value equivalent of those same shares also represent fair value to the Remington shareholders who chose to sell their DuPont stock? That reasoning appeals to a fair minded person's sense of logic, at least where the stock received is fairly valued by the market. The plaintiff here does not challenge, and indeed concedes, the reliability of the market price for DuPont stock, which was (and is) one of the world's most widely held and traded securities.

sent his conclusions as to the fair value of Remington stock. Indeed, Brunner's superior, Mr. Buxbaum, considered the 8% growth rate and a 12% discount rate assumptions to be erroneous, and testified that an appropriate growth rate for Remington in 1979 would have been 6%, and an appropriate discount factor, at least 15%. The evidence is more supportive of Mr. Buxbaum's position than Mr. Belfer's.

During the period 1969–1978, Remington's historical earnings growth rate was 6% per year. Belfer's assumption that Remington's earnings would grow indefinitely at 8% is at odds with that history and ignored the fact that Remington was in a mature industry that faced significant regulatory problems. Belfer's assumption of a 12% discount rate was also erroneous, because that rate was based upon DuPont's cost of capital, not Remington's. The credible evidence establishes that to determine an appropriate discount factor, one must utilize the cost of capital of the company being acquired, not of the acquiring company. In 1979 Remington's cost of capital was considerably higher than 12%: Messrs. Zimmerman and Stott testified that Remington's cost of capital was 20%, and Salomon Brothers used discount rates of 18% and 20%.

### b) *The Adjusted Book Value Analysis*

In his second analysis, Mr. Belfer adjusted Remington's book value ($23.07 per share as of September 30, 1979) upwards to reflect the higher appraised value of Remington Farms and the higher market value of Remington's inventory. The resulting figure was $28.47 per share.

That approach is flawed for two reasons. First, precisely what value the $28.47 per share figure is supposed to represent is unclear. Belfer admitted that he marked up only the inventory and Remington Farms, but gave no consideration to marking up—or down—Remington's other assets. Therefore, to the extent that that exercise was intended to convert book value into a measure of value based upon the market value of Remington's assets, the

$28.47 result was unreliable because it was highly selective and inconsistently applied.

Moreover, Belfer's adjusted book value approach was somewhat akin to comparing apples to oranges. Belfer compared Remington's adjusted book value to DuPont's stock market price, rather than valuing DuPont and Remington shares in the same manner and then comparing those values. Had the same value criteria been compared, DuPont would have been revealed as worth considerably more than $23.46 per share. Like many large corporations, DuPont had assets whose market or replacement value far exceeded their book value. DuPont's inventory had a replacement value of $632 million above book value, its plant had a replacement vaue of $10 billion above book value, and its patents generated $100 million a year in royalty income but were carried on the books at only $1 per patent. Even DuPont's investment in Remington was carried on its books at only $1.70 per share, although in July, 1979, Remington's shares were publicly traded at $15 per share.

For these reasons, Belfer's adjusted book valuation of Remington has no probative value.

### c) *Third Party Inquiry Analysis*

Between August 17, 1979 and January 17, 1980, DuPont and Morgan Stanley received expressions of interest from third parties concerning possible acquisitions of all of Remington at prices of $26 and $27 per share. Neither DuPont, Remington, nor Salomon Brothers pursued these third party inquiries or insisted that they be further explored. Mr. Belfer testified that those expressions of interest constituted persuasive evidence that the value of Remington was at least $26 per share. I cannot concur.

The contacts with DuPont were initial inquiries, not firm offers. They were made contingent upon review of Remington's non-public business and financial information, and on negotiation of satisfactory acquisition agreements. Moreover, the inquiries contemplated an acquisition of the entire company, which could not have oc-

curred without DuPont selling its Remington stock. DuPont had no obligation to sell its stock, *Bershad*, 535 A.2d at 845, and had chosen not to do so. Accordingly, these inquiries do not, in my opinion, constitute persuasive evidence supporting Belfer's view that Remington's minority shareholders could have realized $26–$27 per share for their holdings.

### (d) *Price–Earnings Analysis*

Finally, Belfer applied a price earnings (P/E) multiple of 7 to 8 to Remington's projected 1980 earnings ($4.00, which Belfer reduced to $3.75 per share) to arrive at a value of $26.25 to $30 per share. I find that approach to be deficient as well.

First, the use of estimated 1979 earnings inflated the valuation result. Remington's actual 1979 earnings were $3.30 per share, not $3.75. Based upon the historical 1979 earnings, the actual merger terms reflected a P/E ratio of 7.1, ($23.46 ÷ $3.30 = 7.1), which was within Mr. Belfer's range of P/E ratios.

Second, it is unclear which comparable companies Mr. Belfer relied upon to derive his P/E ratio, and there is substantial reason to doubt that those companies were comparable in a meaningful way. At his deposition Belfer relied on certain comparables, but at trial his list of comparables had changed. In plaintiff's post-trial brief, Mr. Belfer is portrayed as having relied upon two comparables, Coleman (with a P/E of 7 to 8) and Browning (with an acquisition P/E of 20). The resulting confusion as to which comparables plaintiff's expert actually relied upon is accentuated by Remington's unique feature as a one-line-of-business gun company that was 70% owned by another corporation. In that sense neither Browning nor Coleman was comparable to Remington. However, another company that Belfer did not consider—Storm Ruger, which was 70% owned by two families and manufactured handguns—had a P/E ratio of 4.68, markedly less than Belfer's P/E ratio of 7 to 8.

\* \* \*

For the above reasons, I conclude that the merger terms were substantively fair to the Remington minority.

## V. THE CLAIMS AGAINST REMINGTON'S DIRECTORS

■ Finally, the plaintiff claims that Remington's independent directors were grossly negligent in considering, evaluating, negotiating, and approving the merger. Because the Court has found that Remington's minority stockholders were fairly treated in the merger, as a technical matter this Opinion could conclude without addressing the gross negligence claim. However, the interests of judicial economy, and the policy favoring a trial court determination of all principal charges of wrongdoing, make it appropriate to resolve these accusations against Remington's independent directors at this time.

The plaintiff argues that Remington's directors were grossly negligent in several distinct respects. In reviewing those claims, it must be kept in mind that those defendants are cloaked with a presumption that they acted with appropriate due care, and that the plaintiff has the burden to overcome that presumption. *Citron*, 569 A.2d at 64; *Aronson*, 473 A.2d at 812. The plaintiff has failed to carry that burden.

■ In broadest terms, the evidence shows that the Merger Committee's actions were both advised and the product of an appropriately deliberative process. *Cf. A C Acquisitions v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 111 (1986); *compare Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985). Immediately after the committee was formed, Messrs. Stott, Silliman, and Dixon retained highly qualified legal and financial advisors upon whom the Committee relied but also oversaw. Counseled by these advisors, the Committee considered and evaluated the DuPont proposal for over two and one half months, then evaluated and negotiated a superior proposal. The Committee's deliberative process included numerous meetings, independent of the full Board, and attendance at three meetings of the full Board where the pro-

posed merger was considered. Even after the Remington Board approved the revised merger proposal, the Committee pressed Salomon Brothers to reexamine its fairness opinion in light of current market conditions and all other relevant factors. It is against this background that the plaintiff's due care claims will be evaluated.

### A.

The plaintiff first contends that the Remington directors' "less than vigorous conduct" is attributable to their friendly and close relationship with DuPont and its directors. (Pl.Op.Br. at 44). That contention is not so much a clearly articulated claim of wrongdoing as an oblique suggestion that because of such "extraneous influences," the Remington directors were not independent of DuPont and, hence, were disabled from evaluating the proposed merger on its merits. *See Aronson,* 473 A.2d at 816.

The overwhelming evidence shows that the members of the Merger Committee who acted on Remington's behalf in this transaction were independent of DuPont and fully capable of evaluating the merger on its merits. The plaintiffs' contrary suggestion lacks evidentiary and legal support. While the Remington directors may have had cordial relationships with DuPont, that fact, without more, did not disable them from acting independently and in the best interests of the minority stockholders. *Id.*

### B.

The plaintiff next contends that the Merger Committee was grossly negligent because its members did not view their role as requiring them to determine the fairness of the merger. Instead, plaintiff argues, the Committee envisioned its role as being simply to obtain an investment banker's fairness opinion and then, without independently determining the fairness of the merger, passively delegating to the minority stockholders the decision whether or not to approve the transaction.

That contention finds no support in any credible evidence of record. From the outset and throughout the process, the Committee members understood that their overriding responsibility was to the minority shareholders. The suggestion that the Merger Committee envisioned its duty as simply to passively transmit the proposal to stockholders, is manifestly inconsistent with the way the Committee and Salomon actually went about their work.[24] The Committee had numerous meetings with advisors to evaluate the initial and revised proposals, as well as a ten hour negotiating session in which it rejected DuPont's initial merger offer and twice elicited improvements to it. If plaintiff's scenario were correct, the Committee would simply have allowed the minority stockholders to vote on DuPont's initial .52 proposal. Precisely the opposite actually occurred.

### C.

The plaintiff charges that the Committee was grossly negligent because it ignored certain criticisms about the proposed merger made by investment banking houses seeking to be retained by the Committee, as well as criticisms by certain stockholders, and a Value Line report. It is claimed that this information would have shown that the initial merger proposal was unfair.

None of these comments, however, were ignored. They were furnished to Salomon Brothers which, together with the Committee, considered their subject matter. Most importantly, the notes regarding calls from investment bankers seeking to be retained, the July 27, 1979 Value Line report, and the comments from shareholders all pertained to the initial merger proposal which the Committee rejected. Accordingly, the relevance of this contention is, to say the least, obscure.

### D.

Plaintiff next argues that the Merger Committee and the Remington Board were provided no basis for Salomon Brothers'

---

**24.** In its engagement letter, the Committee recognized that Salomon might not be able to opine that the proposed merger was fair, which is precisely what occurred in connection with the initial .52 proposal.

fairness opinion, other than a brief oral discussion on the day the proposal was approved. That contention also lacks evidentiary support.

Only by focusing exclusively on the discussions that occurred at the October 2, 1979 meetings of the Merger Committee and the full Remington Board does this contention attain surface plausibility. However, the argument ignores the fact that for over ten weeks Salomon Brothers continually discussed with the Committee the analysis it was performing. During that time Mr. Stott "was on the telephone to [Salomon] every other day." (TR VII at 152). The argument also ignores the meetings of August 31, 1979 and September 14, 1979, held specifically to review what Salomon Brothers was doing, the all-day negotiating session on September 30, and the October 30, 1979 meeting at which the Committee questioned Salomon at length as to the basis of its opinion. Mr. Zimmerman testified that by October 2 Salomon had "lived with" the Committee since mid-July, and that the Committee had the benefit of all of Salomon Brothers' work. In short, neither Salomon Brothers' analysis nor the Committee's review of that analysis began or ended on October 2, 1979.

### E.

Finally, the plaintiff contends that the Merger Committee had no basis for its decision, because it relied upon Salomon Brothers, whose opinion was not worthy of reliance, as Salomon had not performed an evaluation of Remington. That claim, like the others, has no credible evidentiary support.

Taking plaintiff's arguments in reverse order, the record clearly demonstrates that Salomon Brothers made an evaluation of Remington. DX54, which is an approximately one inch thick book of financial analyses of Remington and DuPont, represented a portion of its work. As earlier discussed, Salomon compared the attributes of ownership enjoyed by Remington stockholders before the merger with those that they would enjoy after the merger, and evaluated Remington stock on a comparative basis in relation to DuPont stock. (See DX 29, DX 75; and pages 40–44 *supra* of this Opinion). Salomon also concluded that share prices of DuPont that created values in the $22 to $25 range represented Remington's fair value. (TR VII at 99–102, 173–78, *see also* this Opinion at pages 45–46). What Salomon Brothers did not do was issue a formal opinion placing a specific dollar value or range of values upon the Remington minority stock.

The record further establishes that although the Committee relied, as it was clearly entitled to do, upon Salomon Brothers for expert financial advice [25], its members applied their own independent business judgment to the advice they received. The testimony of the two surviving Committee members, Messrs. Stott and Dixon, satisfies me that the Committee clearly understood their fiduciary obligation to make the ultimate business judgment, informed by the advice of Salomon. (TR IV at 208–09, TR V at 70, 121).

In summary, the evidence unequivocally establishes that the Committee understood its fiduciary obligations, discharged those obligations carefully and faithfully, and produced an improved transaction that was fair to Remington's minority stockholders.

### VI.

On the basis of the rulings made herein, final judgment will be entered in favor of the defendants and against the plaintiff. Counsel will submit an appropriate form of order.

---

25. 8 *Del.C.* § 141(e); *Polk v. Good,* Del.Supr., 507 A.2d 531, 537 (1986); *Rosenblatt,* 493 A.2d at 943.