# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD J. TORNETTA, Individually and on Behalf of All Others Similarly Situated and Derivative on Behalf of Nominal Defendant TESLA, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **C.A. No. 2018-0408-JRS** |
| ELON MUSK, ROBYN M. DENHOLM, ANTONIO J. GRACIAS, JAMES MURDOCH, LINDA JOHNSON RICE, BRAD W. BUSS, IRA EHRENPREIS, STEVE JURVETSON, and KIMBAL MUSK, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| TESLA, INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted:  June 10, 2019
Date Decided:  September 20, 2019

Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware and Jeremy S. Friedman, Esquire, Spencer Oster, Esquire and David F.E. Tejtel, Esquire of Friedman Oster & Tejtel PLLC, New York, New York, Attorneys for Plaintiff Richard J. Tornetta.

David E. Ross, Esquire, Garrett B. Moritz, Esquire and Benjamin Z. Grossberg, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and William Savitt, Esquire, Anitha Reddy, Esquire and Noah B. Yavitz, Esquire of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendants Elon Musk, Robyn M. Denholm, Antonio J. Gracias, James Murdoch, Linda Johnson Rice, Brad W. Buss, Ira Ehrenpreis, Steve Jurvetson, Kimbal Musk and Nominal Defendant Tesla, Inc.

**SLIGHTS, Vice Chancellor**

In January 2018, Tesla, Inc.'s board of directors (the "Board") approved an incentive-based compensation plan for its chief executive officer, Elon Musk, called the 2018 Performance Award (the "Award"). The Board then submitted the Award to Tesla's stockholders for approval. The stockholders who voted at the specially called meeting overwhelmingly approved the Award and Tesla implemented it thereafter. A Tesla stockholder has brought direct and derivative claims against Musk and members of the Board alleging the Award is excessive and the product of breaches of fiduciary duty. Defendants move to dismiss under Court of Chancery Rule 12(b)(6).

A board of directors' decision to fix the compensation of the company's executive officers is about as work-a-day as board decisions get. It is a decision entitled to great judicial deference.[1] When the board submits its decision to grant executive incentive compensation to stockholders for approval, and secures that approval, the decision typically is entitled to even greater deference.[2] But this is not a typical case. Plaintiff has well pled that Musk, the beneficiary of the Award, is

---

[1] *See Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) ("[A] board's decision on executive compensation is entitled to great deference. It is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money. . .") (internal quotations omitted).

[2] *See Michelson* v. *Duncan*, 407 A.2d 211, 214, 222 (Del. 1979) (holding that an option grant to directors or officers that has been ratified by the stockholders is subject to judicial review only if the award is wasteful); *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (same).

also Tesla's controlling stockholder. And the size of the Award is extraordinary; it allows Musk the potential to earn stock options with a value upwards of $55.8 billion.[3]

Defendants' motion to dismiss presents the gating question that frequently dictates the pleadings stage disposition of a breach of fiduciary duty claim: under what standard of review will the court adjudicate the claim? If the court reviews the fiduciary conduct under the deferential business judgment rule, the claim is unlikely to proceed beyond the proverbial starting line. If, on the other hand, the court reviews the conduct under the entire fairness standard, the claim is likely to proceed at least through discovery, if not trial. Given the high stakes and costs of corporate fiduciary duty litigation, defendants understandably are prone to call the "standard of review" question at the earliest opportunity, usually at the pleadings stage.

In this case, the standard of review question presents issues of first impression in Delaware. On the one hand, as noted, board decisions to award executive compensation are given great deference under our law, particularly when approved by unaffiliated stockholders. On the other hand, as pled, the Award is a transaction

---

[3] As discussed below, the Award is also remarkable for the significant market capitalization and operational milestones Musk must lead Tesla to achieve before the sequential tranches of compensation within the Award are triggered.

2

with a conflicted controlling stockholder and, as such, it ought to provoke heightened judicial suspicion.[4]

Defendants maintain the stockholder vote approving the Award ratified the Board's decision to adopt it and thereby ratcheted any heightened scrutiny of the Award that might be justified down to business judgment review.[5] By Defendants' lights, Plaintiff's only legally viable claim is waste, which he has not adequately pled. In response, Plaintiff argues stockholder ratification cannot alter the standard of review with respect to conflicted controller transactions. The only possible exception to this proposition Plaintiff will acknowledge is that Defendants might have avoided entire fairness review had they implemented the dual protections outlined in the seminal *In re MFW Shareholders Litigation*.[6] Defendants admittedly

---

[4] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 DEL. J. CORP. L. 673, 678 (2005) ("Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder.").

[5] If truth be told, Defendants would say they drew the wrong judge here. In *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293 (Del. Ch. Mar. 28, 2018) ("*Tesla*"), I held the plaintiffs there had well pled both that Musk was a controlling stockholder of Tesla and that demand to bring derivative claims was excused with respect to a majority of Tesla's board. Plaintiff has repeated those same allegations here. While Defendants deny that demand is excused, "out of respect for this Court's recent pleadings-stage decision in [*Tesla*]," they have elected not to move to dismiss under Court of Chancery Rule 23.1. Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Compl. ("OB") 3. Defendants also contest that Musk is Tesla's controlling stockholder but, out of deference to *Tesla*, they have framed their legal arguments as if he was. Tr. of Oral Arg. Re Defs.' Mot. to Dismiss ("OA") at 10–11.

[6] *In re MFW S'holders Litig.*, 67 A.3d, 496, 524–25 (Del. Ch. 2013) (Strine, C.), *aff'd*, *Kahn* v. *M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (holding the business judgment

3

did not follow the *MFW* roadmap. And they reject any suggestion they were required to do so in order to earn business judgment deference. According to Defendants, any such requirement would extend *MFW* beyond its intended bounds and ignore the Delaware law of stockholder ratification.

This court's earnest deference to board determinations relating to executive compensation does not jibe with our reflexive suspicion when a board transacts with a controlling stockholder.[7] Delaware courts have long recognized the risks to sound corporate governance posed by conflicted controllers and generally review these transactions for entire fairness.[8] This doctrinal suspicion has its costs, however. A rule holding corporate fiduciaries personally accountable for *all* transactions with conflicted controllers *unless* the fiduciaries demonstrate the transaction is entirely fair will necessarily suppress at least some beneficial transactions.[9]

---

rule is the "correct standard of review for mergers between a controlling stockholder and its subsidiary, when the merger is conditioned on the approval of both an independent, adequately empowered special committee that fulfills its duty of care, and the uncoerced, informed vote of a majority of the minority stockholders").

[7] Strine, *supra* note 4, at 678.

[8] *See generally Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110 (Del. 1994); *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422 (Del. 1997); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Summa v. Trans World Airlines, Inc.*, 540 A.2d 403 (Del. 1988).

[9] Mary Siegel, *The Erosion of the Law of Controlling Shareholders*, 24 DEL. J. CORP. L. 27, 73–75 (1999) (distinguishing between conflicted controller transactions where the benefits outweigh the burdens from those where the controller's self-interested pursuits result in harm to the corporation, and positing that "monitoring all controlling-shareholder transactions by entire fairness is overkill.").

This tension was front and center in *MFW*, albeit in the context of a transformational transaction, and the court resolved it by approving a process whereby consummation of the transaction is conditioned from the beginning on the informed and impartial approval of decision makers at both the board and stockholder levels.[10] As the court explained, preserving the integrity of the decisions at both levels in the conflicted controller context is key to allaying the court's suspicions such that our preference for presumptive deference can be restored:

> [T]he adoption of this rule will be of benefit to minority stockholders because it will provide a strong incentive for controlling stockholders to accord minority investors the transactional structure that respected scholars believe will provide them the best protection, a structure where stockholders get the benefits of independent, empowered negotiating agents to bargain for the best price and say no if the agents believe the deal is not advisable for any proper reason, plus the critical ability to determine for themselves whether to accept any deal that their negotiating agents recommend to them. A transactional structure with both these protections is fundamentally different from one with only one protection. A special committee alone ensures only that there is a bargaining agent who can negotiate price and address the collective action problem facing stockholders, but it does not provide stockholders any chance to protect themselves. A majority-of-the-minority vote provides stockholders a chance to vote on a merger proposed by a controller-dominated board, but with no chance to have an independent bargaining agent work on their behalf to negotiate the merger price, and determine whether it is a favorable one that the

---

[10] *In re MFW S'holders Litig.*, 67 A.3d at 504 (explaining that the dual protections provide comfort that beneficial controlling stockholder transactions will not be subject to judicial second-guessing). While *MFW* was decided on a motion for summary judgment, the Supreme Court has since held *MFW* also applies at the pleadings stage. *See Flood v. Synutra Int'l Inc.*, 195 A.3d 754 (Del. 2018) (affirming the trial court's application of the *MFW* framework on a motion to dismiss).

5

bargaining agent commends to the minority stockholders for acceptance at a vote. These protections are therefore incomplete and not substitutes, but are complementary and effective in tandem.[11]

*MFW* addressed a post-closing stockholder challenge to a freeze-out merger, and neither the Court of Chancery nor the Supreme Court provided any indication their holdings were intended to apply outside of that context. Subsequent decisions of this court, however, have applied the *MFW* framework to controller transactions involving the sale of a company to a third party[12] and a stock reclassification.[13] In both cases, however, as Defendants observe, the transactions at issue "fundamentally alter[ed] the corporate contract" and, therefore, were subject by statute to approval by both the board of directors and a majority of outstanding shares entitled to vote.[14] Indeed, this is the line Defendants would have the Court draw in delineating *MFW*'s reach; the dual protections endorsed by *MFW* should be required to earn business judgment deference only with respect to transformational conflicted

---

[11] *In re MFW S'holders Litig.*, 67 A.3d at 502–03. *See also Kahn v. M&F Worldwide Corp.*, 88 A.3d at 644 (observing that "[t]he simultaneous deployment of the procedural protections employed here create a countervailing, offsetting influence of equal—if not greater—force.").

[12] *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089 (Del. Ch. Aug. 18, 2017).

[13] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964 (Del. Ch. Dec. 11, 2017).

[14] 8 *Del. C.* §§ 242, 251.

controller transactions where the Delaware General Corporation Law requires the approval of both the corporation's managers and owners.[15]

There is symmetry in Defendants' view of *MFW*. If a controlling stockholder seeks to draw the corporation into a transaction that, by statute, cannot be consummated without the approval of both the board and the stockholders, then it makes sense to require the controller to condition consummation on the informed approval of both independent board members and unaffiliated stockholders if he wishes to secure our law's most deferential standard of review at the threshold. But does it make sense to impose those same dual protections on the controller and the board as a predicate to application of the business judgment rule in instances where the DGCL does not require both board and stockholder approval? Or, should the fiduciaries in that context be able to trigger business judgment review through traditional stockholder ratification?

To answer this question, I have returned to first principles. In instances where the beneficiary of a transaction is a controlling stockholder, "there is an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its

---

[15] Defs.' Reply Br. in Supp. of its Mot. to Dismiss ("RB") 3.

public stockholders."[16] Because the conflicted controller, as the "800-pound gorilla,"[17] is able to exert coercive influence over the board and unaffiliated stockholders, "our law has required that [] transaction[s] [with conflicted controllers] be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders."[18] In these circumstances, stockholder approval of the conflicted controller transaction, alone, will not justify business judgment deference.[19]

The controlling stockholder's potentially coercive influence is no less present, and no less consequential, in instances where the board is negotiating the controlling stockholder's compensation than it is when the board is negotiating with the controller to effect a "transformational" transaction. In my view, stockholder

---

[16] Strine, *supra* note 4, at 678. *See also Citron v. E.I. DuPont de Nemours & Co.*, 584 A.2d 490, 502 (Del. Ch. 1990) (explaining that controllers can coerce minority stockholders as well, "[e]ven where no coercion is intended").

[17] *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (Strine, V.C.).

[18] Strine, *supra* note 4, at 678.

[19] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 306 (Del. 2015) (Strine, C.J.) (noting a valid stockholder vote cleanses transactions "with a party other than a controlling stockholder").

ratification, without more, does not counterpoise the risk of coercion in either context.[20]

Having determined entire fairness is the standard by which the Award must be reviewed, it is appropriate to consider whether, in circumstances like this, the Board could have structured the approval process leading to the Award in a way that provides a "feasible way for defendants to get [cases] dismissed on the pleadings."[21] As I see it, *MFW* provides the answer. In this regard, I share Defendants' view that neither the Chancery nor Supreme Court opinions in *MFW* can be read to endorse an application of *MFW* beyond the squeeze-out merger. But that does not mean *MFW*'s dual protections cannot be potent neutralizers in other applications. In this case, had the Board conditioned the consummation of the Award upon the approval of an independent, fully-functioning committee of the Board and a statutorily compliant vote of a majority of the unaffiliated stockholders, the Court's suspicions regarding the controller's influence would have been assuaged and deference to the Board and stockholder decisions would have been justified. As that did not happen

---

[20] *See In re EZCORP Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *12 (Del. Ch. Jan. 25, 2016) (holding that entire fairness applies whenever the controller "extracts a non-ratable benefit.").

[21] *In re MFW S'holders Litig.*, 67 A.3d at 504; *see also In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 n.2 (Oct. 10, 2016) (confirming that "one purpose of [*MFW*] was to remedy a doctrinal situation in which there was no feasible way to get cases dismissed on the pleadings") (quotation omitted).

9

here, Defendants' motion to dismiss the breach of fiduciary duty claims must be denied.[22]

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Complaint[23] and documents incorporated by reference or integral to the Complaint, including publicly filed SEC documents.[24] Tesla produced documents to Plaintiff pursuant to 8 *Del. C.* § 220 ("Section 220 Documents"). The parties have agreed that I should deem the Section 220 Documents as incorporated by reference in the Complaint.[25] For now, the Complaint's well-pled allegations are accepted as true.[26]

### A. The Parties

Plaintiff, Richard J. Tornetta, is, and was at all relevant times, a Tesla stockholder.[27] He brings both direct claims on behalf of a putative class of Tesla stockholders and derivative claims on behalf of the Company.

---

[22] Defendants have also urged the Court to dismiss on the ground Plaintiff has failed to state a claim that the Award is not entirely fair. For reasons explained below, I disagree.

[23] Citations to the Complaint are to "Compl. ¶ __."

[24] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[25] Compl. ¶ 1.

[26] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[27] Compl. ¶ 8.

Nominal Defendant, Tesla, is a public Delaware corporation headquartered in Palo Alto, California.[28] It designs, manufactures and sells electric vehicles and energy storage systems.[29]

At the time the Complaint was filed, Tesla's Board comprised nine members: Musk, Kimbal Musk, Antonio J. Gracias, Stephen T. Jurvetson, Ira Ehrenpreis, Brad W. Buss, Robyn M. Denholm, James Murdoch and Linda Johnson Rice.[30] The members of the Board's Compensation Committee at the time of the Award were Ehrenpreis (Chair), Gracias, Denholm and Buss.[31]

Defendant, Musk, is Tesla's largest stockholder.[32] At the time the Award was approved, Musk owned approximately 21.9% of Tesla's common stock and served as Tesla's Chairman (from April 2004 until September 2018),[33] CEO (since October

---

[28] Compl. ¶ 9.

[29] *Id.*

[30] Compl. ¶¶ 10–19.

[31] Compl. ¶¶ 12, 14–16. For purposes of this motion to dismiss, I have assumed, as Defendants do, that a majority of the Compensation Committee was not independent of Musk's influence. OA at 10–11.

[32] Compl. ¶ 10.

[33] Following a settlement with the SEC, Musk stepped down as Chairman in November 2018 and was replaced by Ms. Denholm. Press Release, SEC, ELON MUSK SETTLES SEC FRAUD CHARGES; TESLA CHARGED WITH AND RESOLVES SECURITIES LAW CHARGE, 2018-226 (Sept. 29, 2018) https://www.sec.gov/news/press-release/2018-226.

2008) and Chief Product Architect.[34]  For purposes of this motion to dismiss only, it is not disputed Plaintiff has well pled that Musk is Tesla's controlling stockholder.[35]

In addition to his roles at Tesla, Musk is the majority shareholder, Chairman, CEO and Chief Technology Officer of Space Exploration Technologies Corporation ("SpaceX"), a private company that develops and launches rockets to deliver commercial satellites into space.  SpaceX plans, eventually, to deliver humans to space as well.[36]  It is alleged SpaceX is one of the world's most valuable private companies.[37]

## B. Musk's Historical Compensation as CEO

Musk assumed his role as Tesla's CEO in 2008 and, at that time, was paid $1 per year annual salary with no equity compensation.[38]  In December 2009, Musk was awarded options that vested on a three-year schedule contingent on his continued service with Tesla.[39]  He also received options contingent on achieving

---

[34] Compl. ¶¶ 10, 22.

[35] OA at 10–11.

[36] Compl. ¶ 10.

[37] *Id.*

[38] Transmittal Aff. of Garrett B. Moritz Ex. ("Ex.") 12 (Tesla Registration Statement (S-1) Jan. 29, 2010) at 134.

[39] *Id.* at 131–32.

certain operating milestones.[40]  After Tesla's initial public offering in 2010, Musk continued to receive $1 in annual salary with no equity awards in that year or in 2011.[41]

In 2012, Musk had nearly reached all the operational milestones set for him in the 2009 option grant.[42]  With this in mind, the Compensation Committee retained an outside consultant to review Musk's compensation.[43]  Following its review, the Compensation Committee recommended, and the Board adopted, an entirely performance-based option award for Musk (the "2012 Award").[44]

The 2012 Award consisted of ten tranches of stock options, each tranche representing 0.5% of Tesla's shares outstanding on the date of the grant.[45]  The vesting of each tranche was entirely contingent on Tesla achieving both a market capitalization milestone and an operational milestone.[46]  If the milestones were

---

[40] *Id.*

[41] Ex. 14 (Tesla Proxy Statement (14A) June 4, 2013) at 22; Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 5.

[42] Ex. 13 (Tesla Annual Report (10-K) Feb. 27, 2012) at 4.

[43] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 5.

[44] *Id.*

[45] *Id.* at 5–6.

[46] *Id.* at 6.

missed, Musk received nothing.[47]  The 2012 Award had a ten-year term; if a tranche did not vest within the term, it would expire.[48]

Each of the ten market capitalization milestones in the 2012 Award required an increase of $4 billion in Tesla's market capitalization, compared to Tesla's market capitalization of $3.2 billion when the award was granted.[49]  The operational milestones included producing and designing new vehicle models, increasing production of an existing vehicle (Tesla's Model S) and increasing gross margin.[50]  Within five years of the Board approving the 2012 Award, Tesla had achieved all of the market capitalization milestones and was on the verge of reaching all but one of the operational milestones.[51]

## C. The 2018 Performance Award

As 2018 approached, the Compensation Committee realized a new compensation package for Musk would soon be necessary.  Accordingly, it retained outside counsel and Compensia, the same executive compensation firm that assisted

---

[47] *Id.*

[48] Ex. 2 (Presentation to the Tesla Compensation Committee, June 23, 2017) at 22.

[49] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 7.

[50] *Id.*; Ex. 2, (Presentation to the Tesla Compensation Committee, June 23, 2017) at 22.

[51] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 2.

in the design of the 2012 Award, to review Musk's compensation.[52]  In considering a new package, the Compensation Committee also solicited the advice of Tesla's other directors (excluding Kimbal Musk).[53]

The Compensation Committee was faced with a difficult question: how to keep Musk focused on Tesla given his other business interests.[54]  By 2017, SpaceX was among the largest private companies in the world and Musk played an active role in SpaceX's management.[55]  The Compensation Committee viewed Musk as instrumental to Tesla's success and keeping him locked in on Tesla was a top priority.[56]

Using the 2012 Award as a model, the Compensation Committee began crafting a new compensation package in mid-2017.[57]  The Compensation Committee proposed a 10-year grant of stock options that would vest in twelve tranches, again contingent upon reaching market capitalization and operational milestones.[58]  After

---

[52] Ex. 1 (Tesla Compensation Committee Meeting Mins., June 23, 2017) at 1–2.

[53] Ex. 5 (Tesla Compensation Committee Meeting Mins., Aug. 1, 2017) at 1.

[54] Ex. 1 (Tesla Compensation Committee Meeting Mins., June 23, 2017) at 1.

[55] Compl. ¶ 10.

[56] Ex. 1 (Tesla Compensation Committee Meeting Mins., June 23, 2017) at 1.

[57] *Id.* at 2.

[58] *Id.*

conferring with Tesla's largest institutional investors, the company tied the operational milestones to increases in total revenue and adjusted EBITDA.[59]

Over a series of meetings in 2017, the Compensation Committee and Musk negotiated the milestones at which the options would vest, the overall size of the grant and how share dilution would affect the Award.[60] The full Board approved the Award at its January 2018 meeting.[61]

Each of the Award's market capitalization milestones requires a $50 billion increase in Tesla's market capitalization.[62] Reaching the first market capitalization milestone would roughly double Tesla's market capitalization as of the date the Award was approved, and reaching all 12 would likely make Tesla one of the most valuable public companies in the world.[63] The Award's annual revenue milestones range from $20 billion to $175 billion, and the adjusted EBITDA milestones range from $1.5 billion to $14 billion.[64]

---

[59] Ex. 10 (Tesla Board of Directors Meeting Mins., Dec. 12, 2017) at 2.

[60] Ex. 7 (Tesla Compensation Committee Meeting Mins., Sep. 8, 2017) at 2; Ex. 8 (Tesla Board of Directors Meeting Mins., Sep. 19, 2017) at 1–2; Ex. 9 (Tesla Board of Directors Meeting Mins., Nov. 16, 2017) at 2; Ex. 10 (Tesla Board of Directors Meeting Mins., Dec. 12, 2017) at 2.

[61] Compl. ¶ 34.

[62] *Id.*

[63] Ex. 4 (Tesla Compensation Committee Meeting Mins., July 7, 2017) at 23.

[64] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 9.

Upon reaching the twin milestones corresponding to each tranche of the Award, options held by Musk representing 1% of Tesla's current total outstanding shares will vest.[65] By tying the shares Musk receives to outstanding shares at the time of the grant, as opposed to 1% of the fully diluted shares at the time of vesting, the cost of dilution is born by Musk.[66] The Award restricts Musk's ability to sell vested shares for five years, tying him more closely to Tesla.[67] Any options that do not vest within ten years are forfeited, and no options will vest if, at the time the relevant milestone is met, Musk is not serving as either CEO or both Executive Chairman and Chief Product Officer with the CEO reporting directly to him.[68] The Award also provides that milestones will be adjusted if Tesla makes acquisitions having a material impact on reaching any milestone, ensuring the milestones will be met through organic growth, not acquisitions.[69]

If none of the tranches of options vest, Musk will earn nothing under the Award.[70] Alternatively, if every market capitalization and operational milestone is

---

[65] Compl. ¶ 34.

[66] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 18.

[67] *Id.* at 10.

[68] *Id.* at 13.

[69] *Id.* at 11.

[70] *Id.* at 2.

17

reached, options will vest with a maximum potential value of $55.8 billion.[71] Tesla estimated the Award's preliminary aggregate fair value at $2.615 billion on its proxy statement.[72]

## D. The 2018 Stockholder Vote

The Board conditioned implementation of the Award on the approval of a majority of the disinterested shares voting at a March 21, 2018, special meeting of Tesla stockholders.[73] On February 8, 2018, Tesla submitted its proxy statement describing the Award and recommending that shareholders vote to approve it.[74] The proxy statement described the Award in detail and expressly conditioned its approval on receiving a majority vote of the shares not owned by Musk or Kimbal Musk.[75] It explained that a failure to vote (assuming a quorum was present at the meeting) would not be counted as a no vote (as it would for a vote on a merger), but instead would have no effect on the vote.[76]

---

[71] Compl. ¶ 36.

[72] Compl. ¶ 37.

[73] Compl. ¶ 52.

[74] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018).

[75] Compl. ¶ 52.

[76] Ex. 18 (Tesla Proxy Statement (14A) Feb. 8, 2018) at 23.

The Award was approved by the shareholders, with 81% of voting shares and 80% of shares present and entitled to vote cast in favor.[77] At the final tally, 73% of disinterested shares at the meeting (those not affiliated with either Musk or Kimbal Musk) voted in favor of the Award.[78] This equated to approximately 47% of the total disinterested shares outstanding.[79]

### E. Procedural History

After Tesla disclosed stockholder approval of the Award, Plaintiff demanded to inspect certain books and records relating to the Award pursuant to 8 *Del. C.* § 220. Upon receiving responsive documents, Plaintiff filed his Complaint in which he asserts four claims: (1) a direct and derivative claim for breach of fiduciary duty against Musk in his capacity as Tesla's controlling shareholder for causing Tesla to adopt the Award; (2) a direct and derivative claim for breach of fiduciary duty against the Director Defendants for approving the Award; (3) a derivative claim for unjust enrichment against Musk; and (4) a derivative claim for waste against the Director Defendants.[80]

---

[77] Ex. 19 (Tesla Current Report (8K) Mar. 21, 2018) at 2.

[78] *Id.*

[79] Compl. ¶ 55.

[80] Compl. ¶¶ 106–23.

On August 30, 2018, Defendants filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6). The Court heard argument on May 9, 2019.

## II. ANALYSIS

The legal standards governing a motion to dismiss for failure to state a claim are well settled. Under Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on facts pled in the complaint.[81] "All well-pleaded factual allegations are accepted as true[,]" and "the Court must draw all reasonable inferences in favor of the non-moving party. . . ."[82]

### A. The Fiduciary Duty Claims

I resolve Defendants' motion to dismiss the breach of fiduciary duty claims in two parts. First, I address the proper standard of review. As explained below, I conclude entire fairness is the applicable standard at this pleadings stage given Plaintiff's well-pled allegations. Next, I address whether Plaintiff has stated viable breach of fiduciary duty claims as viewed through the lens of entire fairness, and conclude he has.

---

[81] *Gen. Motors*, 897 A.2d at 168 (internal quotations omitted).

[82] *Savor, Inc. v. FMR Corp.*, 812 A.2d, 894, 896–97 (Del. 2002) (internal citations omitted).

## 1. The Standard of Review

As in nearly all pleadings stage challenges to the viability of a breach of fiduciary duty claim in the corporate context, deciding the proper standard of review in this case will be outcome determinative.[83] In this regard, Defendants urge the Court to keep its sights trained on the nature of the decision at issue here, and for good reason. A board's decision to grant executive compensation is usually entitled to "great deference."[84] But Defendants acknowledge (for purposes of this motion only) that Musk is a controlling shareholder and that he dominated the Board and the Compensation Committee during the time the Award was negotiated and approved.[85] Thus, in the absence of stockholder ratification, Defendants acknowledge (for purposes of this motion only) that the Court must review the Award for entire fairness.[86]

Citing seminal Delaware authority, however, Defendants maintain the Court must review the Award under the business judgment rule because Tesla's

---

[83] *See Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) ("It is often of critical importance whether a particular decision is one to which the business judgment rule applies or the entire fairness rule applies.").

[84] *See Eisner*, 746 A.2d at 263 ("a board's decision on executive compensation is entitled to great deference. It is the essence of business judgment for a board to determine if a particular individual warrants large amounts of money . . .") (quotation omitted).

[85] OA 10–11.

[86] OB 4 (citing *Michelson*, 407 A.2d at 211; *Vogelstein*, 699 A.2d at 336).

stockholders have overwhelmingly approved all aspects of Musk's compensation.[87]

Plaintiff disagrees on two grounds. First, he argues the stockholder vote was structurally inadequate to ratify breaches of fiduciary duty because a majority of all outstanding disinterested shares did not vote to approve the Award.[88] Second, he argues even if the vote might otherwise be adequate to ratify the Award, it cannot, as a matter of equity, ratify an incentive compensation plan where the company's controlling stockholder is the beneficiary.[89] I address the arguments in turn.

### a. The Structure of the Vote

According to Plaintiff, the 2018 stockholder vote approving the Award did not produce ratifying effects because "Delaware law is clear that the 'cleansing effect of ratification' requires the **_affirmative_** approval of a majority of **_all_**

---

[87] RB 7.

[88] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("AB") 5.

[89] Plaintiff argued for the first time in his Answering Brief that Tesla's proxy disclosures regarding the Award were incomplete and misleading. He made no such allegations in his Complaint. Consequently, I will not address Plaintiff's argument that ratification does not apply because the Tesla stockholder vote was uninformed. "When defendants filed their motions to dismiss [Plaintiff] had a choice to make under Court of Chancery Rule 15(aaa). [He] could either seek leave to amend [his] complaint or stand on [his] complaint and answer the motion to dismiss. Having chosen the latter course of action, [he] is bound to the factual allegations contained in [his] complaint. [He] cannot supplement the complaint through [his] brief." _MCG Capital Corp. v. Maginn_, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010).

22

disinterested shares, not a mere majority of whatever subset of disinterested shares actually votes."[90] Defendants make two points in response, both persuasive.

First, Plaintiff's principal supporting authority, *PNB*, involved a cash-out merger where, by statute, the stockholder vote required to approve the transaction was an affirmative vote of the majority of all outstanding shares.[91] No such statutory requirement existed with respect to the Award.

Defendants' second point expands on their first. Tesla submitted the Award for stockholder approval in accordance with the statute that governs stockholder votes on non-extraordinary stockholder action, like approval of executive compensation plans. Section 216 of the Delaware General Corporation Law (titled "Quorum and required vote for stock corporations") prescribes the default requirements a stockholder vote must meet to approve a corporate action when the

---

[90] AB 46 (emphasis in original) (citing *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006) (Strine, V.C.) (holding "[t]he cleansing effect of ratification depends on the intuition that when most of the affected minority affirmatively approves the transaction, their self-interested decision to approve is sufficient proof of fairness to obviate a judicial examination of that question. I do not believe that the same confidence flows when the transaction simply garners more votes in favor than votes against, or abstentions from, the merger from the minority who actually vote. That position requires an untenable assumption that those who did not return a proxy were members of a 'silent affirmative majority of the minority.'"").

[91] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15.

DGCL does not otherwise dictate a different voting structure for a "specified action."[92]  Section 216(1) sets the default minimum for a quorum:

> (1) A majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum at a meeting of stockholders.

And Section 216(2) sets the default minimum for the affirmative voting threshold:

> (2) In all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders.

When a stockholder vote governed by Section 216 meets the prescribed quorum and voting requirements, the outcome "shall be the act of the stockholders," even though the number of shares voted in favor of the corporate action at issue may have been less than a majority of the outstanding shares entitled to vote.

The stockholder vote approving the Award fell under the default quorum and voting threshold requirements of Section 216 because no other provision of the DGCL dictates "the vote that shall be required for" the issuance of options or other compensation to directors or officers, and Tesla's charter and bylaws did not specify different requirements.[93]  And the vote clearly satisfied the statutory requirements:

---

[92] 8 *Del. C.* § 216.

[93] *See* Ex. 16 (Tesla Current Report (8-K) Feb. 1, 2017) (disclosing amended charter and bylaws).

24

(1) a majority of Tesla's outstanding shares entitled to vote were present at the meeting, and (2) a majority of the shares present at the meeting and entitled to vote did, in fact, vote to approve the Award.

Given these undisputed facts, there is no basis to say the stockholder vote approving the Award did not produce a ratifying effect. The vote met the quorum and voting threshold requirements of Section 216 even when considering only the disinterested shares: (1) a majority (64%) of Tesla's outstanding disinterested shares entitled to vote were present at the meeting, and (2) a majority (73%) of those disinterested shares were voted in favor of the Award.[94] In the ordinary course, therefore, the stockholder vote would justify business judgment deference.

### b. Stockholder Ratification Does Not Justify Business Judgment Deference Because the Award Benefits a Conflicted Controller

In the realm of criminal jurisprudence, it is accepted that "death (capital punishment) is different."[95] I suppose the same could be said of conflicted controller transactions in our corporate fiduciary jurisprudence; they are, in a word, "different."

---

[94] Ex. 19 (Tesla Current Report (8-K) Mar. 21, 2018) at 2; Compl. ¶ 53. *See In re Investors Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1211 (Del. 2017) ("stockholder ratification means a majority of fully informed, uncoerced, and disinterested stockholders approved board action. . . ."); *Michelson*, 407 A.2d at 221 (holding that a stockholder vote ratified an option award to directors and officers upon determining that a majority of the shares represented at the meeting voted in favor of the plan after receiving a proper disclosure of the plan's terms).

[95] *Rauf v. State*, 145 A.3d 430, 436 (Del. 2019) (Strine, C.J. concurring).

25

Our courts are steadfast in requiring corporate fiduciaries to prove entire fairness when a controller stands on both sides of a transaction.[96] These cases range from squeeze-out mergers,[97] to asset purchases,[98] to consulting agreements.[99] And when conflicted controllers are involved, our courts will not allow the controller to rely upon stockholder approval of the transaction at the pleadings stage to "cleanse" otherwise well-pled breaches of fiduciary duty.[100]

Disparate treatment of controlling shareholder transactions makes good sense. It is settled in Delaware that stockholder votes will not ratify director action if there is "a showing that the structure or circumstances of the vote were impermissibly

---

[96] *See EZCORP*, 2016 WL 301245, at *12–15 (eruditely detailing why our law generally requires conflicted controller transactions to be entirely fair); Strine, *supra* note 4, at 678 ("For that reason, when a controlling stockholder is on the other side of the deal from the corporation, our law has required that the transaction be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders.").

[97] *Lynch*, 638 A.2d at 1117.

[98] *Kahn v. Tremont Corp. (Tremont I)* 1996 WL 145452 (Del. Ch. Mar. 21, 1996) (Allen, C.) *rev'd on other grounds, Tremont II*, 694 A.2d 422 (Del. 1997).

[99] *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536 (Del. Ch. 2000).

[100] *Corwin*, 125 A.3d at 306 ("Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority . . . [for] transaction[s] with a party *other than a controlling stockholder*. . .") (emphasis added); *Larkin v. Shah,* 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (holding that "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder."); *In re Merge Healthcare, Inc. S'holders Litig.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017) (same).

coercive."[101]  "The determination of whether coercion was inequitable in a particular circumstance is a relationship-driven inquiry."[102]  And, without doubt, our law recognizes the relationship between a controlling stockholder and minority stockholders is fertile ground for potent coercion.[103]  Indeed, as our Supreme Court has observed:

> Even where no coercion is intended, shareholders voting on a parent subsidiary merger might perceive that their disapproval could risk retaliation of some kind by the controlling stockholder. . . .  At the very least, the potential for that perception, and its possible impact upon a shareholder vote, could never be fully eliminated. . . .  Given that uncertainty, a court might well conclude that even minority shareholders who have ratified a . . . merger need procedural protections beyond . . . full disclosure of all material facts.[104]

In *Pure Resources*, then-Vice Chancellor Strine aptly described the controlling stockholder as an "800-pound gorilla whose urgent hunger for the rest of

---

[101] *Williams v. Geier*, 671 A.2d 1368, 1382 (Del. 1996).

[102] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *15 (Del. Ch. Apr. 11, 2017).

[103] *Saba*, 2017 WL 1201108, at *16.  *See also Pure Res.*, 808 A.2d at 441 ("controlling shareholders have the ability to take retributive action in the wake of rejection by an independent board, a special committee, or the minority shareholders.  That ability is so influential that the usual cleansing devices that obviate fairness review of interested transactions cannot be trusted."); *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *15 (Del. Ch. May 31, 2017) ("Thus, controller transactions are inherently coercive, and a transaction with a controller cannot be ratified by a vote of the unaffiliated majority; the concern is that fear of controller retribution in the face of a thwarted transaction may overbear a determination of best corporate interest by the unaffiliated majority.").

[104] *Lynch*, 638 A.2d at 1116 (citing *Citron*, 584 A.2d 490).

the bananas is likely to frighten . . . minority stockholders [who] would fear retribution from the gorilla if they defeated the merger and he did not get his way."[105] Chancellor Allen called controlling shareholder transactions "the context in which the greatest risk of undetectable bias may be present. . . ."[106]

Defendants acknowledge the threat of coercion inherent in conflicted controller transactions but argue the concern is less pressing, and less worthy of protection, in transactions, like the Award, that do not "alter the corporate contract."[107] I disagree. While stockholders generally would have no reason to feel coerced when casting a non-binding, statutory Say on Pay vote,[108] or when asked to approve a board-endorsed executive compensation plan, I discern no reason to think minority stockholders would feel any less coerced when voting against the controlling CEO's compensation plan than they would when voting to oppose a transformational transaction involving the controller. In both instances, minority stockholders would have reason to fear controller retribution, e.g., the controller "force[ing] a squeeze-out or cut[ting] dividends . . . ."[109]

---

[105] *Pure Res.*, 808 A.2d at 436.

[106] *Tremont I*, 1996 WL 145452, at *7.

[107] OB 24–25.

[108] 15 U.S.C. § 78 n-1 (2012).

[109] *Pure Res.*, 808 A.2d at 442.

Indeed, in the CEO compensation context, the minority knows full well the CEO is staying with the company whether *vel non* his compensation plan is approved. As our Supreme Court observed in *Tremont II*:

> [I]n a transaction such as the one considered . . . the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction. The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder.[110]

These words apply with equal force to the compensation setting.

Having found no principled basis to distinguish the coercive implications of controller compensation transactions from other (even transformational) conflicted controller transactions, I can find no basis to conclude, on the pleadings, that the stockholder vote approving the Award would not be subject to the coercive forces inherent in controlling stockholder transactions.[111] Since Plaintiff has well pled the Compensation Committee and Board processes with respect to the Award were also subject to the controller's coercive influence, at this stage, I must conclude the Award was not duly approved by either of Tesla's qualified decision makers.[112]

---

[110] *Tremont II*, 694 A.2d at 428 (internal citations omitted).

[111] *See Ahmed*, 2017 WL 7053964, at *11 (finding "no principled basis" to differentiate squeeze-out mergers from "other forms of controller transactions.").

[112] *See Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 WM. MITCHELL L. REV. 1443, 1458–59 (2014) (describing the corporation's two "qualified decision makers" as the independent, disinterested board of directors and the unaffiliated stockholders). I note that neither party cited *Friedman v. Dolan*, 2015 WL 4040806 (Del. Ch. June 30, 2015), where the court

Entire fairness, therefore, is the appropriate standard of review at this pleadings stage.[113]

### c. What is a Controlling Stockholder/CEO to Do?

Our law recognizes the costs and downstream implications of fiduciary litigation in the corporate context and has provided road maps to avoid such consequences.[114] *Corwin* allows more searching standards of review that might otherwise apply to be reduced to business judgment review when the transaction is approved by a majority of disinterested, fully informed and uncoerced stockholders.[115] *MFW* provides a roadmap that allows fiduciaries to engage in

---

determined that business judgment review was appropriate in connection with a board's decision to award allegedly excessive compensation to a controlling stockholder who served as CEO. *Id.* at *2–3. In *EZCORP*, Vice Chancellor Laster discussed *Dolan* at length and ultimately found the decision distinguishable and unpersuasive, in part, because the court in *Dolan* emphasized the complaint there had not alleged facts that would allow a reasonable inference of coercion. *EZCORP*, 2016 WL 301245, at *17–23. For this and the other reasons stated in *EZCORP*, I also find *Dolan* (and the cases cited there) distinguishable.

[113] I say "at this pleadings stage" because I appreciate Defendants will challenge the factual bases for Plaintiff's allegations that Musk is Tesla's controlling stockholder in discovery and may well elect to bring this issue before the court again on a motion for summary judgment. Since my conclusion respecting standard of review rests entirely on the premise that Musk is a conflicted controller, a determination otherwise down the road may carry case dispositive consequences.

[114] *See In re MFW S'holders Litig.*, 67 A.3d at 504; *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 n.2 (confirming that "one purpose of [*MFW*] was to remedy a doctrinal situation in which there was no feasible way to get cases dismissed on the pleadings.") (quotation omitted).

[115] *Corwin*, 125 A.3d at 312 ("Finally, when a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs

conflicted controller transactions worthy of pleadings stage business judgment deference.[116]  In the conflicted controller context, in particular, *MFW*'s "dual protections" are meant to "neutralize" the conflicted controller's "presumptively coercive influence" so that judicial second-guessing is no longer required.[117]

Defendants see no place for *MFW* here.[118]  They rely heavily on a "statutory rubric" argument, claiming *MFW*'s dual protections, devised in the context of a

---

of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.").

[116] *In re MFW S'holders Litig.*, 88 A.3d at 645 (allowing for business judgment review if, from the outset, "(i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.").  Of course, the reason these procedural protections yield business judgment deference is because they incentivize the transacting parties to act efficiently and in the best interests of the corporation and all shareholders.  *See* Zohar Goshen, *The Efficiency of Controlling Corporate Self-Dealing: Theory Meets Reality*, 91 CALIF. L. REV. 393, 429 (2003) (noting "[t]herefore, shifting the burden of proof [under *Khan v. Lynch*] provides the market with the incentive to seek the support of the majority of the minority, thereby reducing the need for judicial judgment on the value of the deal."); Ronald J. Gilson, & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. PA. L. REV. 785, 787–89 (2003) (arguing that judicial review of controller transactions can allow shareholders to enjoy the reduced management costs controlling shareholders provide while reducing the likelihood controlling shareholders will tunnel wealth).

[117] *In re Rouse Prop., Inc.*, 2018 WL 1226015, at *1 (Del. Ch. Mar. 9, 2018).

[118] *See* RB 9–15.  Defendants advance their argument against application of *MFW* to underscore their position that stockholder ratification, alone, should be adequate to downgrade the standard of review.  While I have rejected the argument in that context, it is appropriate to consider it again here when deciding whether *MFW* might provide a means to earn pleadings stage business judgment deference to a board's decision to award compensation to an executive who is also a controlling stockholder.

31

squeeze-out merger, mimic the approvals required by 8 *Del C.* § 251 but have no practical application to transactions where our law does not mandate approval at both the board and stockholder levels.[119] As support, Defendants cite this court's holding in *Pure Resources* for the proposition that the dual protections should apply only when confronting the "statutory rubric" of a merger.[120] I read the case differently.

*Pure Resources* addressed the applicable standard of review when a controlling stockholder makes a tender offer for the shares he does not own, and ultimately held entire fairness does not apply to such transactions if the tender offer is not otherwise coercive.[121] After a lengthy discussion of the symmetry between the DGCL (particularly Section 251) and the *Lynch* line of Supreme Court precedent endorsing dual protections,[122] the court concluded it was not terribly useful to look for statutory symmetry in the tender offer context that does not exist and, instead,

---

[119] RB 9. As the statute governing this vote, 8 *Del. C.* § 216 does not require dual approval, the argument goes, *MFW* should not be applied.

[120] RB 11.

[121] *Pure Res.*, 808 A.2d at 430–33.

[122] *Id.* at 433.

focused on what best protects the interests of minority stockholders.[123] That same practical approach to equitable problem solving makes sense here as well.[124]

While I reject Defendants' statutory symmetry argument, I do agree with Defendants that nothing in *MFW* or its progeny would suggest the Supreme Court intended to extend the holding to other transactions involving controlling stockholders.[125] That does not mean, however, that *MFW*'s dual protections cannot provide useful safeguards here. Just as in the squeeze-out context, preconditioning a controller's compensation package on both the approval of a fully functioning, independent committee *and* an informed, uncoerced vote of the majority of the minority stockholders will dilute the looming coercive influence of the controller. With *MFW*'s dual protections in place, the minority stockholders can cast their votes

---

[123] *Id.* at 441 (putting aside statutory symmetry to ask the normative question "[i]s there reason to believe that the tender offer method of acquisition is more protective of the minority, with the result that less scrutiny is required than of negotiated mergers with controlling stockholders?").

[124] Defendants also point to *Glassman v. Unocal Expl. Corp.*, 777 A.2d 242 (Del. 2001) as an example of a Delaware court utilizing the statutory rubric to formulate its equitable review. RB 11. In *Glassman*, however, the court found that plaintiff's proffered "equitable review" of the tender offer at issue "plainly conflict[ed] with the [applicable] statute." *Glassman*, 777 A.2d at 247. No such "plain conflict" exists here. The Board's power to set executive compensation is codified in 8 *Del. C.* §§ 122(5), (15); nothing in that statute "plainly conflicts" with the notion that additional procedural protections should apply when the executive is also a controlling shareholder.

[125] More precisely, I see nothing in either the Chancery or Supreme Court *MFW* decisions to suggest either court intended to hold that the dual protections are required in all controlling stockholder transactions in order to reduce the degree of judicial scrutiny paid to the transaction.

33

knowing the controller has agreed at the outset to negotiate his compensation award with an independent, fully functioning committee of the board, to condition consummation of the award on that committee's endorsement, and to allow the unaffiliated stockholders to have the final say. Under these circumstances, the minority stockholders have far less reason to fear that the controller will retaliate if the committee or minority stockholder votes do not go his way.[126]

Had the Board ensured from the outset of "substantive economic negotiations"[127] that both of Tesla's qualified decision makers—an independent, fully functioning Compensation Committee *and* the minority stockholders—were able to engage in an informed review of the Award, followed by meaningful (i.e., otherwise uncoerced) approval, the Court's reflexive suspicion of Musk's coercive influence over the outcome would be abated.[128] Business judgment deference at the

---

[126] *In re MFW S'holders Litig.*, 67 A.3d at 502–03.

[127] *Olenik v. Lodzinski*, 208 A.3d 704, 715 (Del. 2019).

[128] Although I have rejected Defendants' statutory symmetry argument as a basis not to apply *MFW* to non-transformational transactions, I do think the symmetry analysis makes sense when determining the stockholder vote that is required to satisfy the "majority of the minority" prong of *MFW*'s dual protections. Specifically, for transactions, like the Award, where 8 *Del. C.* § 216 governs the stockholder vote, the vote required to satisfy *MFW*'s "majority of the minority" prong need only be the majority of the minority shares voting after a quorum has been reached, not the majority of all minority shares outstanding. In this regard, I see no reason to require a more stringent voting standard to trigger *MFW*'s adjustment of the standard of review than the statute governing the vote would require to reflect a valid "act of the stockholders." *Id.*

pleadings stage would then be justified. Plaintiff has well pled, however, that the Board level review was not divorced from Musk's influence.[129] Entire fairness, therefore, must abide.

## 2. Plaintiff Has Adequately Pled the Award Was Not Entirely Fair

As Defendants have not satisfied *MFW*'s dual protections, I revert to *Kahn v. Lynch* to guide my review of Plaintiff's breach of fiduciary duty claims.[130] I have determined on the pleadings that Defendants have satisfied the "majority of the minority" condition but have not satisfied the "fully functioning, independent special committee" condition. The burden of persuasion shifts to Plaintiff, therefore, to demonstrate the Award is not entirely fair.[131] At this stage, the bar set for Plaintiff is to demonstrate from well-pled facts that it is reasonably conceivable the Award is unfair to Tesla.[132] As explained below, he has cleared the bar, albeit just barely.

As things stand, Plaintiff is obliged to plead and prove the Award was not the "product of both fair dealing and fair price."[133] "Often, whether the price paid in a

---

[129] Compl. ¶ 103.

[130] *Lynch*, 638 A.2d at 1117 (holding that the fulfillment of either proper special committee approval or proper vote of the majority of minority stockholders will cause the burden of proving entire fairness to shift from the fiduciary defendants to the stockholder plaintiff).

[131] *Lynch*, 638 A.2d at 1117.

[132] *Gen. Motors*, 897 A.2d at 168.

[133] *Weinberger*, 457 A.2d at 710.

transaction was fair is the 'paramount concern.'"[134]  Because this inquiry is fact

intensive, it is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6)

motion when entire fairness is the governing standard of review.[135]

While Plaintiff alleges both unfair process and unfair price, his focus, not

surprisingly, is on the Award's unfair price.[136]  Specifically, Plaintiff alleges the

Award has a potential value that is orders of magnitude higher than what other highly

paid CEOs earn.[137]  According to Plaintiff, the "fair value estimate of the Plan" is

either $2.6 billion or $3.7 billion, dwarfing the compensation of "the world's most

successful technology executives."[138]  While Defendants dispute Plaintiff's

calculation of the Award's present value, it is reasonably conceivable the present

fair value of the Award is, as Plaintiff alleges, well in excess of that paid to Musk's

peers.

---

[134] *Monroe Cty. Empls.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010); *Weinberger*, 457 A.2d at 711.

[135] *See Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014) ("[t]he possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6). . . ."); *Orman v. Cullman*, 794 A.2d 5, 15 n.36 (Del. Ch. 2002) ("[t]hat conclusion [that entire fairness applies] normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.").

[136] Compl. ¶¶ 37–46.

[137] Compl. ¶¶ 4–5.

[138] Compl. ¶¶ 43–46.

Defendants urge me to consider that the Award is entirely performance based and aligns Musk's incentives with those of the other stockholders. This is particularly important, say Defendants, since Musk has several other business interests, including SpaceX, that might distract him from his work at Tesla. Moreover, given the extraordinary market capitalization and performance milestones built into the Award, Defendants observe it is quite possible Musk will never see the full value of the Award.[139] On the other hand, if Musk leads Tesla to achieve the milestones, then Tesla will be one of the most valuable companies in the world and all stakeholders will have reaped the benefits of Musk's incentivized focus. These are all factors I would consider, if uncontested, on summary judgment or, if contested, at trial. Indeed, they may well carry the day in those contexts. But, on the pled facts, albeit lodged on the "very outer margins of adequacy," it is reasonably conceivable the Award is unfair.[140] Accordingly, Defendant's motion to dismiss Counts I & II must be denied.

## B. The Unjust Enrichment Claim

Plaintiff alleges the Award unjustly enriches Musk. The elements of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a relation between

---

[139] OB 28–45.

[140] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999) (Strine, V.C.).

the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.[141] As Plaintiff acknowledges, this claim essentially duplicates his breach of fiduciary duty claims.[142] If there is no underlying breach, there is no unjust enrichment. Even so, "Delaware law does not appear to bar bringing both claims."[143] While there will be only one recovery, at this stage, I must allow that "factual circumstances [might exist] in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical".[144] Defendant's motion to dismiss Count III is denied.

## C. The Waste Claim

Plaintiff also alleges the Award is "so one-sided that no person acting in good faith pursuant to Tesla's interests could have approved its terms."[145] Not coincidentally, Plaintiff's waste allegations, summarily pled, mirror the standard for waste, where the plaintiff "must allege facts showing that no person of ordinary

---

[141] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).

[142] AB 55.

[143] *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011).

[144] *Maginn*, 2010 WL 1782271, at *25 n.147.

[145] Compl. ¶ 122.

sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation."[146]

While Plaintiff has adequately pled the Award is unfair, "[t]he pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair.'"[147] This is especially so with respect to the Award given that the majority of disinterested stockholders voting at the special meeting approved the Award, and our law recognizes as axiomatic, even on the pleadings, "that stockholders would be unlikely to approve a transaction that is wasteful."[148] The well-pled facts fail to support a reasonable inference that no person of "ordinary sound business judgment" would have granted the Award, a fact made even more clear in the light of the informed stockholder vote that approved it. Defendant's motion to dismiss Count IV is granted.

---

[146] *Huizenga*, 751 A.2d at 892.

[147] *Id.*

[148] *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016). I appreciate that *Singh* did not involve a controlling stockholder and that its observations regarding the implications of the stockholder vote are less useful when a controller's influence is in the mix. But that is not a reason to ignore the vote altogether when considering whether Plaintiff's waste claim is reasonably conceivable.

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss is **DENIED** as to Counts I, II and III, and **GRANTED** as to Count IV.

**IT IS SO ORDERED.**